Allen TAYLOR, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 434, 2010.

Supreme Court of Delaware.

Submitted: March 23, 2011.
Decided: June 22, 2011.
Reargument Denied July 20, 2011.

Nicole M. Walker, Esquire (argued), Office of the Public Defender, Wilmington, Delaware, for Appellant.

Maria T. Knoll, Esquire (argued), and Gregory E. Smith, Esquire, Department of Justice, Wilmington, Delaware, for Appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

BERGER, Justice, for the majority:

■ In this criminal appeal we consider, among other issues, whether a witness's out-of-court statement was voluntary, and therefore admissible under 11 *Del. C.* § 3507. For the first two hours after he was taken into custody, the witness denied any knowledge of the murder under investigation. The interrogating officer then handcuffed the witness to his chair leg and (falsely) told the witness he was going to be arrested. After breaking down and crying, the witness gave a statement incriminating appellant. The Superior Court reviewed the taped statement and concluded that the statement was voluntary because the witness's will was not overborne. We hold that a statement given by witness who has been handcuffed and told that he is being arrested is presumptively involuntary unless the witness is given the same protections afforded to suspects who are in police custody. Accordingly, we reverse.

### Factual and Procedural Background

One evening in August 2008, Jaiquon Moore was walking down West 5th Street, in Wilmington, Delaware. He passed three men—Allen Taylor, Timmy Carter, and Steven Sanders—who were sitting on some steps. After passing them, Moore turned back. The three men stood up and started approaching Moore. The men exchanged words. Then Taylor pulled out a gun and shot Moore twice. Taylor, Car-

ter, and Sanders fled as a crowd gathered around Moore, who was dying.

The police never recovered the weapon or any shell casings. There was no DNA evidence, fingerprint evidence, video from surveillance cameras, or confession. The police did track Taylor's cell phone calls. The police learned that about two hours after the killing, Taylor used his cell phone from a location about two miles from the crime scene. About one hour after that, the cell phone was tracked to Haddonfield, New Jersey, near the New Jersey Turnpike. The following afternoon, the cell phone was used in Brooklyn, New York, and continued to be used in the New York City area for about four days. Taylor was arrested in New York several months later.

Several witnesses testified at trial. Raheem Smith, a friend of Moore's, testified that he saw Moore pass Carter, Sanders, and Taylor, and within seconds he heard gunshots. Smith did not see who shot Moore. Aieyenia Bailey gave conflicting statements to the police. In one, she said she saw Carter hand Taylor a gun. At trial, she testified that she did not see anyone with a gun. Lashelle Kent testified that Taylor shot Moore with a silver gun. Her testimony conflicted, to some extent, with her statement to the police. Sanders testified that he did not see the shooting. The State introduced his videotaped statement, in which Sanders identified Taylor as the person who shot Moore.

The jury convicted Taylor of first degree murder and possession of a firearm during the commission of a felony. Taylor was sentenced to life in prison plus 50 years. This appeal followed.

## Discussion

■ Taylor argues that his conviction should be reversed because Sanders' statement, which was a significant part of the State's case, was inadmissible. Under 11 *Del. C.* § 3507, a witness's out-of-court statement may not be admitted as affirmative evidence unless the statement is voluntary. A statement is involuntary if the totality of the circumstances demonstrate that the witness's will was overborne.[1] This Court has recognized several factors that indicate a statement is involuntary: 1) failure to advise the witness of his constitutional rights[2]; 2) lies "about an important aspect of the case ..."[3]; 3) threats that the authorities will take the witness's child away[4]; 4) extended periods of detention without food[5]; and 5) extravagant promises or inducements.[6]

At the time of his interrogation, Sanders was 26 years old, unemployed and homeless. He was taken into custody as he got off of a bus. The police officer told him that he was being brought in on a domestic violence charge. At the station, Sanders was placed in an interrogation room, and Detective Matthew Hall started asking Sanders about the murder of Moore. Hall told Sanders that the police knew Sanders was on the street the night Moore was

1. *Baynard v. State,* 518 A.2d 682, 690 (Del. 1986).

2. *Ibid.*

3. *Ibid.*

4. *Roth v. State,* 788 A.2d 101, 108 (Del.2001); *See, also, Lynumn v. State of Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963).

5. *State v. Rooks,* 401 A.2d 943, 948 (Del. 1979).

6. *Flowers. v. State,* 858 A.2d 328, 330–31 (Del. 2004).

shot, but that the police did not believe Sanders pulled the trigger.

For more than two hours, Hall demanded that Sanders tell him who shot Moore, and Sanders denied that he knew. Hall explained to Sanders that, by fleeing with the others, Sanders appeared to have conspired with them and appeared to be guilty. Hall then left the room for a few minutes. When he returned, Hall handcuffed Sanders to Sanders' chair, and told Sanders: "Here's the deal. I just got off the phone with the A.G.'s Office and you're being arrested." [7] Sanders immediately started crying and yelling, "I do not know, I do not know." [8] and "I can't go to jail." [9] Hall agreed, saying, "You've got two boys to think about." [10] Sanders then asked, "What is it that you want me to say?" [11] Hall replied that he wanted Sanders to tell him the truth.

Sanders stopped crying and eventually agreed that he was on the block at the time of the shooting. When Sanders stopped providing information, Hall reminded him that Sanders had two boys to think about, and that, if he did not tell Hall who the killer was, the children "might be calling someone else Daddy" [12] for the rest of Sanders' life. Over the next 10 minutes, Sanders told Hall what he saw. Sanders said that he heard a shot and turned to see Taylor with a towel over his hand. Sanders saw sparks coming from the towel as he heard more shots being fired.

The trial court viewed the videotaped statement and concluded that Sanders' will had not been overborne.

### I. *Voluntariness of Sanders' Statement*

██ This Court generally defers to the trial court's factual determination as to voluntariness.[13] There are circumstances unique to this case, however, that require a different analysis. As always, the totality of the circumstances must be considered. And, it is settled law that the police may use tactics such as deceit, threats, and promises without necessarily rendering the witness's statement involuntary.[14] But in this case, Hall handcuffed Sanders and told him that he was being arrested. That was a lie, but Sanders obviously believed Hall, because Sanders started crying and screaming that he did not know anything and that he could not go to jail.

██ The legal issue is whether the § 3507 statement of the witness was voluntary.[15] Since custodial interrogations are inherently coercive, any statement by a defendant in custody is presumptively involuntary in the absence of certain procedural safeguards.[16]

This venerated principle of law was established by the United States Supreme

---

7. Court Ex. 10.

8. *Ibid.*

9. *Ibid.*

10. *Ibid.*

11. *Ibid.*

12. *Ibid.*

13. *Miller v. State,* 1993 WL 307619 (Del. Supr.).

14. *Baynard v. State, supra.*

15. The fact that the § 3507 statement of the witness at issue was videotaped and available for review on appeal does not control our analysis of the voluntariness issue, as the dissenting opinion appears to suggest.

16. The presumption can be overcome. If, for example, the State can show that the witness thought that the interrogator was only trying to scare him, and did not believe that he was being arrested, that would suffice.

Court in *Miranda*[17] in cases involving the custodial interrogations of suspects who are actually under arrest. In those situations, unless the procedural safeguards established by *Miranda* are adhered to, any statement by the accused cannot be admitted into evidence.

■ The principles and rationale for the holding in *Miranda* were recently reaffirmed by the United States Supreme Court in *J.D.B. v. North Carolina:*

> Any police interview of an individual suspected of a crime has "coercive aspects to it." Only those interrogations that occur while a suspect is in police custody, however, "heighte[n] the risk" that statements obtained are not the product of the suspect's free choice.
>
> By its very nature, custodial police interrogation entails "inherently compelling pressures." Even for an adult, the physical and psychological isolation of custodial interrogation can "undermine the individual's will to resist and ... compel him to speak where he would not otherwise do so freely." Indeed, the pressure of custodial interrogation is so immense that it "can induce a frighteningly high percentage of people to confess to crimes they never committed."
>
> Recognizing that the inherently coercive nature of custodial interrogation "blurs the line between voluntary and involuntary statements," this Court in *Miranda* adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination. Prior to questioning, a suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence

of an attorney, either retained or appointed." And, if a suspect makes a statement during custodial interrogation, the burden is on the Government to show, as a "prerequisit[e]" to the statement's admissibility as evidence in the Government's case in chief, that the defendant "voluntarily, knowingly and intelligently" waived his rights.[18]

For those same reasons, we hold that *Miranda's* procedural safeguards apply to the interrogation of a witness who is in custody and is told by the police that he is under arrest.

■ In this case, the interrogating police officer told the witness (falsely) that he was under arrest and handcuffed the witness to a chair in an interrogation room at the police station. The officer wanted the witness to believe he was under arrest for murder. The officer's deception was successful. After the witness stopped crying, he made a statement to the officer that he had refused to make during the two hours of questioning that preceded the officer's false representation that the witness was under arrest.

Although the witness was told and believed that he was under arrest, he was not afforded any of the procedural safeguards recognized in *Miranda* as necessary to mitigate the inherently coercive pressure of a custodial interrogation. Fundamental fairness and the orderly administration of justice require that custodial interrogations be treated consistently. Where the procedural safeguards of *Miranda* are not followed for a defendant who is actually under arrest, any incriminating statement is inadmissible. Where the procedural safeguards of *Miranda* are not followed for a witness who is falsely told, but actu-

---

17. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

18. *J.D.B. v. North Carolina*, —— U.S. ——, 131 S.Ct. 2394, —— L.Ed.2d —— (2011) (internal citations omitted).

ally believes, he is under arrest, constitutional consistency requires that any § 3507 statement that incriminates a third-party be inadmissible as well.

Absent uniform treatment for the custodial interrogation of both a defendant who is *actually* under arrest and a witness who *believes* he is under arrest, the evidentiary results are unfairly and inexplicably inconsistent. The defendant's self-incriminating statement would be inadmissible, yet the § 3507 statement of the witness that incriminates a third-party would be admitted into evidence. That is not how the rule of law should or does operate under our constitutional democracy. In both situations, the custodial interrogations are inherently coercive and both types of statements are inadmissible if the procedural safeguards of *Miranda* are not followed. That must be so, since the concerns that animate *Miranda* are identical in both cases.

As the United States Supreme Court recently explained in *J.D.B.*, "*Miranda's* procedural safeguards exist precisely because the voluntariness test is an inadequate barrier when custodial interrogation is a stake." [19] "Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." [20] The same rule of law must apply to the § 3507 statement of a witness that is the product of a custodial interrogation, where that witness is falsely told that he is under arrest and believes that deception.

## II. *Taylor's Other Claims*

Taylor also raises several other arguments. First, he contends that the trial court abused its discretion by allowing expert testimony on cell phone data mapping. The trial court conducted a *Daubert* hearing, and concluded:

As I understand the process, what Mr. Daly has been asked to do is to ... review information obtained by Nextel relating to this particular cell phone number. That information, when matched to a key which is provided by Nextel, will give the latitude and longitude of the tower which was used when a call was made or received. And, either by using a map or a computer program, it is a simple, straight-forward thing to locate that tower on a map.... So I find his qualifications are more than ample to do this. Insofar as Daubert is concerned, the unrebutted testimony here is that this [Is] a recognized process, and is deemed reliable by the law enforcement community.... [21]

The trial court's findings are supported by the record and we find no abuse of discretion in allowing Daly's expert testimony into evidence.

■ Taylor next argues that the trial court improperly commented on the evidence. First, he complains that the trial court should not have allowed Daly to correct his Powerpoint presentation. Daly had been told by Nextel that a "zero" on the call log meant that the cell phone was used for text messaging. He included that information in his Powerpoint presentation. After Daly testified, a Nextel employee testified that a zero means that there was a call hang up. In light of this discrepancy, the trial court allowed Daly to correct his Powerpoint presentation, subject to cross-examination. Taylor does not explain, and we cannot determine, how this

---

**19.** *J.D.B. v. North Carolina,* 131 S.Ct. at —— (citing *Miranda v. Arizona,* 384 U.S. at 458, 86 S.Ct. 1602).

**20.** *Miranda v. Arizona,* 384 U.S. at 458, 86 S.Ct. 1602.

**21.** Appellant's Appendix, A–98.

series of events could amount to a "comment" on the evidence.

Second, Taylor contends that one of the trial court's jury instructions was an improper comment on the evidence. Sanders and another witness testified that they did not want to be labeled "snitches." Other witnesses also testified that they did not want to be in court giving testimony. The trial court decided, over Taylor's objection, that it should give the following instruction:

> The State contends that some of the witnesses have given testimony or made statements during their police interviews that they feared for their safety or for the safety of their loved ones. The State does not contend, and there is no evidence, that the defendant or anyone took any steps to threaten, intimidate or harm either the witnesses or their families. Thus, I instruct you that you may not consider any statements which might have been made by those witnesses in which they expressed fear for their safety or the safety of their families as evidence by itself of the defendant's guilt. However, you may consider, if you choose to do so, those statements for another purpose. If you find that a witness made statements during an interview inconsistent with statements made during his or her testimony, you may consider, if you choose to do so, evidence of the witness's fear of reprisal in determining which version of the facts told by the witness is likely true.

Taylor argues that this instruction impermissibly highlighted one particular factor bearing on credibility. In addition, the instruction impermissibly supported the State's argument that the witnesses' statements to police were the accurate ones, and that the witnesses gave different testimony in court because they did not want to be snitches.

We agree with Taylor that the second part of the instruction could have been written in a more neutral way. Telling the jurors that they may consider the fear of reprisal when trying to reconcile inconsistencies, does suggest that the police statements are more likely the accurate ones. Although we find no reversible error, we suggest that when this case is retried, the trial court should reword this instruction, if it is given at all.

■ Finally, Taylor argues that the use of his nickname, "Murder," was highly prejudicial. Taylor fails to mention that he agreed to an instruction, given before the start of trial, that explained Taylor's nickname and warned the jury not to consider it as evidence of guilt. In addition, several witnesses only knew Taylor by his nickname. The use of the nickname, with the limiting instruction, was not plain error. That said, the nickname is prejudicial and it does not appear from this record that the State's witnesses had to be allowed to use it instead of his given name. Those witnesses who only knew Taylor by his nickname could have been asked, in court, whether they recognized the defendant, without asking what name they knew him by. The questioning then could have proceeded using Taylor's real name. Again, in the retrial, the court should make an effort to delete all references to Taylor's nickname, if possible.

### Conclusion

Based on the foregoing, the judgment of the Superior Court is reversed and this matter is remanded for a new trial. Jurisdiction is not retained.

STEELE, Chief Justice, and RIDGELY, Justice, dissenting:

Allen Taylor asks us to reverse his conviction for first degree murder and grant

him a new trial. He makes several arguments on appeal: (1) Steven Sanders's witness statement to the police was involuntary and therefore inadmissible under 11 *Del. C.* § 3507,[22] (2) the trial judge abused his discretion by allowing expert testimony on cell phone data mapping, (3) the trial judge improperly commented on the evidence at two distinct junctures, and (4) the use of Taylor's nickname—Murder—at trial was inappropriately prejudicial. The Majority reverses his conviction on the basis of his section 3507 argument by creating a bright line presumption of involuntariness, but finds no independently reversible error with respect to his other arguments. We agree with the Majority's resolution of his "other" arguments. Because, however, we believe we owe trial judge voluntariness determinations significant deference on a case by case basis, we cannot agree to reverse, and we respectfully dissent.

## I. SUPPLEMENTAL FACTS

We do not dispute the Majority's recitation of the facts and procedural background in this case, but we provide the following facts to supplement the Majority's account. As the Majority explains, the police arrested Sanders for domestic violence and took him to the police station where Detectives Hall and Knoll questioned him about Jaiquon Moore's murder in an interrogation room. The detectives videotaped the questioning. Sanders testi-

fied at trial that he agreed to speak with Detective Hall voluntarily.

For the first two hours of questioning, the two detectives repeatedly asked Sanders whether he knew who shot Moore, and Sanders answered twenty six times that he did not know. Shortly after the detectives left the room, Hall returned alone, handcuffed one of Sanders' hands to his chair, informed Sanders that he had contacted the Attorney General's office, and alerted Sanders that he was "being arrested." At this time, Hall had his gun holstered on his belt. Hall testified at trial that he had never actually contacted the Attorney General's office and that the police never intended to arrest Sanders for a homicide.

As the Majority explained, Hall instructed Sanders to tell him the truth when Sanders asked Hall, "What is it you want me to say?" Hall also repeatedly told Sanders "Don't bullshit me," and he demanded that Sanders not just tell him something "because you think it's gonna get you out of trouble." At one point, Hall reminded Sanders, "You've got two boys to think about." Later, Hall reminded Sanders that if Sanders stopped supplying information and ended up going to prison, then Sanders' children "might [soon] be calling someone else Daddy." Hall testified that Sanders was never in custody for Moore's murder. Taylor's attorney confirmed at trial that while Hall made a future threat to charge Sanders, Hall nev-

---

**22.** 11 Del. C. § 3507 Use of prior statements as affirmative evidence.

    (a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

    (b) The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not. The

rule shall likewise apply with or without a showing of surprise by the introducing party.

    (c) This section shall not be construed to affect the rules concerning the admission of statements of defendants or of those who are codefendants in the same trial. This section shall also not apply to the statements of those whom to cross-examine would be to subject to possible self-incrimination.

er took Sanders into custody for the murder. After the questioning ended, the Attorney General never charged Sanders with any form of homicide.

At trial, Sanders contradicted his out of court statement and testified that he never saw the shooting. When the State tried to introduce Sanders's videotaped statement under 11 *Del. C.* § 3507, Taylor objected on the basis that the statement was involuntary and, therefore, inadmissible. After observing Sanders's trial testimony, reviewing the video, and considering the evidence, the trial judge ruled that Sanders gave the statement voluntarily. Specifically, he explained:

I make the following findings concerning this interview. First, I am required to consider the totality of the circumstances in the interview. I believe that I am required to determine whether there has been overreaching by the police during the course of the interview. The interview lasted, according to the tape, about three hours and four minutes, but it was actually a less duration than that, and this three hours and four minutes did include breaks.

I find that the [sic] there was no physical intimidation of the witness by Detective Hall, nor do I find there were any promises made by Detective Hall other than discussions about protecting or seeking to protect—other than promises not to plaster the witness's name in the News Journal. The witness does not appear to be tired or intoxicated. I saw no request from the witness as to whether he wanted food or drink, or an additional break to go to the bathroom. At one point in time Detective Hall tells the witness that he is going to be arrested for murder, and the witness breaks down.

However Detective Hall waited until after the witness had recovered before beginning his examination. Detective Hall made obvious efforts to calm the witness down before continuing with the investigation. And notably at no time did Detective Hall suggest to the witness what his answers were to be.

And so I find that in the totality of circumstances, that Detective Hall acted within the limits of the Constitution. I do not find any evidence of police overreaching. Therefore, I am going to admit the statement if it is properly offered.

On redirect examination, Sanders testified that he knew how "snitches" were treated in his neighborhood and that he did not want to be labeled a "snitch."

Detective Hall also interviewed Raheem Smith, Moore's longtime friend. Several weeks after the shooting, Smith was in prison for violating his probation. Hall told Smith that if Smith gave Hall information, Hall would help him with his violation of probation. At trial, Smith testified that on August 18, 2008, he observed Moore walk down Fifth Street past Carter, Sanders, and Taylor while talking with his grandmother outside Charmer's Bar. Second later, he heard gunshots, ran inside Charmer's and pushed his grandmother inside, came out of Charmer's, and saw Moore laying on the ground. Carter, Sanders, and Taylor were gone, but he did not see who actually shot Moore.

Later, Detective Hall spoke with Max Turner—another of Moore's friends. Turner was incarcerated when the shooting happened, but asked his girlfriend, Aieyenia Bailey, to give Hall information about the murder because she was there when it happened. Bailey identified Taylor as the shooter out of a six person photo lineup and told Hall that she saw Taylor—wearing a yellow shirt and holding a silver and black gun—run past her after she heard gunshots. At trial, however, Bailey stated

that she saw *someone* in a yellow shirt with a gun, but she was not sure whether that person was Taylor. The prosecution played Bailey's interview with Hall for the jury.

Turner also told his other girlfriend, Lashelle Kent, to speak with Hall. Hall told Kent that if she gave him information about the murder, then he would help Turner. Kent identified Taylor, who she said was wearing a black shirt, as the shooter. At trial, Kent testified that she watched Moore get into an argument with Carter, Sanders, and Taylor, Taylor pull out a silver gun and shoot Moore, and Carter, Sanders, and Taylor then ran away.

Taylor now argues that the trial judge committed legal error when he found Sanders's statement to be voluntary. We heard oral argument on all of the issues in Taylor's appeal, and we viewed Sanders's videotaped statement.

## II. STANDARD OF REVIEW

We review the admission of a section 3507 statement for abuse of discretion.[23] Whether a witness made his out of court statement voluntarily is a question of fact, and we review the trial judge's determination of that question to ensure that competent evidence supports it.[24] Thus, the trial judge's decision to admit the section 3507 statement is reversible only if the decision was clearly erroneous.[25] When we review

an act of judicial discretion, we "may not substitute [our] own notions of what is right for those of the trial judge, if his judgment was based upon conscience and reason, as opposed to capriciousness or arbitrariness."[26]

## III. DISCUSSION

The initial question of section 3507 voluntariness is a question of fact for the trial judge (and ultimately for the jury), and the judge must consider the effect that the totality of circumstances has on the will of the declarant.[27] The question the trial judge must resolve is whether the conduct of the police overbore the will of the declarant when he made his statement.[28] This determination is for the trial judge to make on a case by case basis,[29] and the central question a trial judge faces is "whether the behavior of the interrogators was such as to overbear the will of the interrogated to resist and bring about a statement 'not the product of a rational intellect and a free will' without regard to the truthfulness or reliability of the statements."[30]

The Majority acknowledges that this Court defers to trial judges' factual determinations regarding voluntariness, and that trial judges must consider the totality of the circumstances when making voluntariness determinations. The Majority also recognizes that police may use deceit

**23.** *Turner v. State*, 5 A.3d 612, 615–16 (Del. 2010).

**24.** *Ortiz v. State*, 841 A.2d 308, 2004 WL 77860, at *2 (Del.2004) (ORDER) (citing *Martin v. State*, 433 A.2d 1025, 1032 (Del.1981)).

**25.** *Flonnory v. State*, 893 A.2d 507, 515 (Del. 2006).

**26.** *Spencer v. Wal–Mart Stores East, LP*, 930 A.2d 881, 888 (Del.2007) (quoting *Dover Historical Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1089 (Del.2006)).

**27.** *See Miller v. State*, 630 A.2d 1103, 1993 WL 307619, at *2 (Del.1993) (ORDER).

**28.** *Id.*

**29.** *Baynard v. State*, 518 A.2d 682, 691 (Del. 1986).

**30.** *State v. Rooks*, 401 A.2d 943, 948–49 (Del. 1979) (citing *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961)).

without necessarily rendering a statement involuntary.[31] Nevertheless, the Majority uses the facts of this case to establish a bright line rule that in every case where police lie to a witness during an interrogation by telling him that he is going to be charged with a crime, unless the police give the witness *Miranda* warnings,[32] any statement that witness makes is presumptively involuntary for purposes of section 3507. We believe that this bright line rule runs contrary to this Court's important and reasoned policy of deferential review in section 3507 voluntariness cases.

Our standard of review in these cases is intentionally—indeed, appropriately—deferential. The trial judge is present during the hearings and trial, he actually observes witness testimony and demeanor, and he understands how the various circumstances and evidence fit together in the context of the overall trial. Generally, because we are unable to glean all of the possible nuances from a "cold" record on appeal, our review is deferential on fact issues.

It is tempting, though misguided, in our opinion, to consider this case to be somehow different because the critical relevant evidence was a videotaped statement and we therefore have the ability to view the same videotaped statement preferred that the trial judge viewed before making his voluntariness determination. As an initial matter, even with the capacity to view the same evidence, our review is not *de novo;* we are still limited to determining only whether sufficient evidence exists to support the trial judge's determination.[33] Our mere disagreement with the factual conclusions of the trial judge, short of finding that a particular conclusion is "clearly erroneous," is insufficient for us to overturn those conclusions on the basis that they were abuses of discretion.[34]

This limited review is important. It is risky, if not presumptuous, for us to assume that our consideration of the videotaped statement is the same as the trial judge's. We do not have the benefit of background familiarity with Sanders, the trial context, or other evidence. We never saw Sanders testify at trial. The trial judge did. We do not believe this Court can make an informed assessment of Sanders's credibility and demeanor—as the trial judge was able to do within the trial's context—by merely reading the cold transcript of the testimony at trial and by viewing the videotape at a time and place far removed from trial. We cannot agree with the Majority's bright line rule because this Court has reaffirmed repeatedly that voluntariness is a case by case determination to be made under the totality of the circumstances. With a bright line rule, no matter the totality of the circumstances, a presumption of involuntariness may require suppression. This consequence runs contrary to our established section 3507 precedent.

In this case, we believe sufficient evidence supports the trial judge's determination of voluntariness and his judgment was

**31.** *See Baynard,* 518 A.2d at 691 (explaining how the detective's lies to the defendant were not "sufficient trickery to overcome the defendant's will").

**32.** *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ("Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.").

**33.** *See, e.g., id.; Hopkins v. State,* 501 A.2d 774, 777 (Del.1985); *Anderson v. State,* 452 A.2d 955, 957 (Del.1982).

**34.** *See Flonnory v. State,* 893 A.2d 507, 515 (Del.2006).

not clearly erroneous. As the judge specifically discussed, the three hour interview included breaks, Hall never physically intimidated Sanders, and Sanders did not appear tired or intoxicated. Hall handcuffed one of Sanders's hands to his chair, which was reasonable considering that Knoll had left the room and Hall's gun was holstered on his hip. After Hall told Sanders he was "going to be charged," Sanders broke down, but Hall did not begin asking Sanders more questions until after Sanders regained his composure. Hall repeatedly told Sanders to tell the truth and not to say something simply because he thought that it would keep him out of trouble. Moreover, we can draw an inference from the trial testimony that Sanders gave his statement voluntarily, but because he had second thoughts about being labeled a "snitch," he testified falsely about the motivation underlying his out of court statement to avoid incriminating Taylor at trial. Sanders played the role of the classic "turncoat witness." Ultimately, the judge made a careful factual finding on the record after reviewing the videotape, the record evidence supports that finding, and that should end our inquiry.[35]

The bright line rule that the Majority creates here dictates that if the police lie to a witness—not a suspect—by telling him he is or will be under arrest, then any statement that witness makes is presumptively involuntary for section 3507 purposes unless the police give that witness *Miranda* warnings before he makes the statement. We believe *Miranda* has no place in our section 3507 jurisprudence and that the public policy underlying *Miranda* is inapposite on the facts of this case.

First, *Miranda's* majority opinion[36] limited itself to cases of custodial interrogation of "the defendant."[37] Here, Sanders was not in custody for the murder when he made the statement, and he was not "the defendant" in the murder trial. Second, the Supreme Court required *Miranda* warnings because of its abiding concern for safeguarding the Fifth Amendment privilege which the founders designed to protect a criminal defendant against self-incrimination, and the Court repeatedly made that intention clear in its majority opinion.[38] In fact, the Supreme Court

---

**35.** *See Flowers v. State*, 858 A.2d 328, 331 (Del.2004) ("The trial judge admitted Sudler's out-of-court pretrial statement to Detective Brock only after making a careful factual finding that Sudler gave the statement voluntarily. Because the record supports the trial judge's findings, we affirm her denial of Flowers' objection to the admission of the statement.").

**36.** A bare majority of five justices joined the majority opinion in *Miranda*. Three justices joined one dissenting opinion, and a fourth justice dissented separately. Of course, the five justice majority opinion would bind us in a case involving a federal constitutional law question; we only cite the fractured court to explain why we opt for a narrow and cautious approach to extending *Miranda* to apply to our section 3507 jurisprudence—a matter of state law alone.

**37.** *E.g., Miranda*, 384 U.S. at 444, 86 S.Ct. 1602 ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of *the defendant* . . . .") (emphasis added).

**38.** *See, e.g., id.* at 439, 86 S.Ct. 1602 ("[W]e deal with the admissibility of statements . . . and the necessity for procedures which assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself."); *id.* at 444, 86 S.Ct. 1602 ("[T]he prosecution may not use statements . . . unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."); *id.* at 498, 86 S.Ct. 1602 ("In dealing with custodial interrogation, we will not presume that a defendant has been effectively apprised of his rights and that his privilege against self-incrimination has been adequately safeguarded on a record that does

clearly differentiated cases implicating self-incrimination from those cases otherwise implicating "voluntariness":

> In [the consolidated cases under review], *we might not find the defendants' statements to have been involuntary in traditional terms.* [But, o]ur concern for adequate safeguards to protect precious Fifth Amendment rights is, of course, not lessened in the slightest.[39]

Sanders' statement did not incriminate him. The police did not suspect that he committed the murder, and the State never tried to introduce his statement against him after charging him with any crime.

*Miranda* protects a criminal defendant against the State using his out of court statement against him at his own trial unless the police employ adequate safeguards to assure that, when giving the out of court statement, the defendant understands his constitutional privilege against self-incrimination. To expand *Miranda* by analogy to exclude a statement from *a witness*—not the defendant—who gives an out of court statement that is used at *the defendant's* criminal trial to implicate *the defendant* is, in our estimation, to misread the reasoning underlying the *Miranda* majority opinion and to exceed its articulated logical bounds. Section 3507 voluntariness, at least on these facts, does not implicate either the federal Fifth Amendment privilege against self-incrimination or its state constitutional counterpart. Indeed, without any Fifth Amendment im-

plication, section 3507 cases like this one fall into the other, more "traditional" voluntariness category the Supreme Court acknowledged in its *Miranda* majority opinion.[40] We believe, therefore, that an analogy to *Miranda* has no place in our section 3507 voluntariness discourse—at least not as a basis for any newly created bright line presumption of involuntariness.

## IV. CONCLUSION

We believe the trial judge's decision was not clearly erroneous. This Court's review of his judgment is limited, and we believe the judge did not abuse his discretion by determining that Sanders's statement was voluntary for purposes of section 3507. We cannot agree with the Majority's establishment of a bright line rule in the context of section 3507 voluntariness because we believe it abridges trial judges' discretion and runs contrary to the appropriate case by case totality of the circumstances approach that our binding precedent requires. We also cannot agree with the Majority's extension of *Miranda,* by analogy, on these facts. We would affirm Taylor's conviction. Therefore, we respectfully dissent.

not show that any warnings have been given or that any effective alternative has been employed.").

**39.** *Id.* at 457, 86 S.Ct. 1602 (emphasis added).

**40.** *See id.*