IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FREDERICK GRAY, | § | No. 251/252, 2014 |
| | § | |
| Defendant Below, | § | |
| Appellant, | § | Court Below – Superior Court |
| | § | of the State of Delaware, in and |
| v. | § | for New Castle County |
| | § | |
| STATE OF DELAWARE, | § | Cr. Id. No. 1302002738A |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: September 16, 2015
Decided: October 9, 2015

Before **HOLLAND**, **VAUGHN**, and **SEITZ**, Justices.

## <u>ORDER</u>

This 9th day of October, 2015, upon consideration of the parties' briefs and the record below, and following oral argument, it appears to the Court that:

(1)   Wilmington police officer Justin Wilkers was shot in the face and seriously wounded following a car chase. A Superior Court jury found Frederick Gray, a passenger in the car, guilty of attempted murder and several other charges for shooting Officer Wilkers. In this direct appeal Gray argues the Superior Court erred by not granting a mistrial after the State turned over a supplemental police report for the first time during trial that Gray contends contained *Brady v.*

*Maryland*[1] material, causing prejudice to his defense. He also argues that the court erred by admitting as a voluntary statement under 11 *Del. C.* § 3507 a prior out-of-court statement by his mother, Shana Gray, made to police the evening after Officer Wilkers' shooting. Gray contends that his mother's statement identifying Frederick Gray as the gunman was involuntary and should not have been admitted. We have determined that Gray's arguments are without merit. Therefore, we affirm the judgment of the Superior Court.

(2) On February 3, 2013, Wilmington police officers Justin Wilkers and Kevin Murphy were on patrol in a marked patrol car on the east side of Wilmington near Buttonwood Street.[2] They encountered a white Chevrolet Equinox SUV and initiated a traffic stop after noticing that the vehicle was not equipped with working brake lights or tail lights.[3] Instead of stopping, the Equinox sped away.[4] A chase ensued. Eventually, the Equinox pulled over near Peach Street in Wilmington.[5] Officer Murphy testified that he saw two men exit the driver's side of the vehicle and flee.[6] He chased the man who came from the

---

[1] 373 U.S. 83 (1963).
[2] App. to Answering Br. at 208 (Trial Test. of Ofc. Justin Wilkers, Jan. 23, 2014).
[3] *Id.*
[4] *Id.*
[5] *Id.* at 209.
[6] App. to Answering Br. at 60 (Trial Test. of Ofc. Kevin Murphy, Jan. 15, 2014).

driver's seat, Jarred Wiggins, and ultimately apprehended him.[7] As he was chasing Wiggins, he heard gunshots behind him.[8]

(3) Officer Wilkers testified that, as he got out of the passenger side of the patrol car, he made eye contact with the front-seat passenger of the Equinox, who was exiting the car.[9] At trial, Officer Wilkers identified that individual as Gray and testified Gray pointed a small, black semi-automatic handgun at him.[10] Officer Wilkers was then shot in the face.[11] It was a life-threatening injury.[12]

(4) Ronald Boyce was the man Corporal Murphy saw flee from the driver's side rear passenger door of the Equinox.[13] Boyce testified at trial that he saw Gray exit the front passenger door of the Equinox and he saw Gray shoot Officer Wilkers.[14]

(5) Detective George Pigford recorded an interview with Officer Murphy at the Wilmington Police Station the day of Officer Wilkers' shooting, February 3, 2013.[15] The State provided the recorded interview to the defense.[16] The following day, Detective Pigford interviewed Officer Murphy a second time at the shooting

---

[7] *Id*. at 62-64.
[8] *Id*. at 65.
[9] App. to Answering Br. at 210 (Trial Test. of Ofc. Justin Wilkers, Jan. 23, 2014).
[10] *Id*. at 211-12.
[11] App. to Answering Br. at 174 (Trial Test. of Amy Steir, Jan. 17, 2014).
[12] *Id*. at 176.
[13] App. to Answering Br. at 115-16 (Trial Test. of Ronald Boyce, Jan. 16, 2014).
[14] *Id*. at 116; 119.
[15] Ex. B to Opening Br. at 3-4 (Det. Pigford's Supplemental Report).
[16] App. to Answering Br. at 61 (Trial Transcript).

scene and summarized the second interview in a supplemental report.[17] The defense first learned about the supplemental report the second day of trial.[18] In the first interview, Detective Pigford recorded that Officer Murphy told him he chased two individuals who fled from the Equinox the day of the shooting.[19] In the second interview, Detective Pigford recorded that Officer Murphy told him he saw two individuals flee from the driver's side of the Equinox but he chased only one, the driver.[20]

(6) The evening after the shooting, police picked up Gray's mother, Shana Gray, and told her she needed to accompany them to the police station.[21] While at the station, Detective Pigford recorded an interview with her.[22] In the interview Shana Gray stated that her son had confessed to her that he shot Officer Wilkers.[23]

(7) The State indicted Gray for attempted murder in the first degree, robbery in the first degree, two counts of possession of a firearm during commission of a felony, two counts of possession of a firearm by a person prohibited, possession of a weapon with a removed, obliterated or altered serial

---

[17] Ex. B to Opening Br. at 13 (Det. Pigford's Supplemental Report).
[18] App. to Answering Br. at 61 (Trial Transcript).
[19] Ex. B to Opening Br. at 3 (Det. Pigford's Supplemental Report).
[20] *Id.* at 13.
[21] App. to Opening Br. at 102-03 (Trial Test. of Shana Gray, Jan. 17, 2014).
[22] App. to Answering Br. at 160 (Trial Test. of Shana Gray, Jan. 17, 2014).
[23] Court Ex. 1.

number, conspiracy second degree, and resisting arrest.[24] Gray proceeded to trial in January, 2014 for attempted murder in the first degree, one count of possession of a firearm during the commission of a felony, and possession of a weapon with a removed, obliterated or altered serial number.[25] The jury found him guilty on all charges.[26] The trial judge sentenced Gray to a life term plus forty years incarceration.[27]

Gray's *Brady* Claim

(8) Gray's first claim on appeal is that Detective Pigford's supplemental police report, first turned over to the defense the second day of trial, included material that the State was obligated under *Brady* to turn over to the defense prior to trial. In light of the State's tardy production of the report, Gray argues that the Superior Court abused its discretion when it failed to order a mistrial.

(9) This Court reviews the Superior Court's decision to deny a motion for a mistrial for abuse of discretion.[28] Reversal is warranted only where the denial "was based on unreasonable or capricious grounds."[29] A mistrial is appropriate only when there are "no meaningful or practical alternatives to that remedy" or

---

[24] App. to Opening Br. at 17-21 (Indictment).
[25] App. to Opening Br. at 1 (Superior Court Docket).
[26] *Id.*
[27] Ex. E. to Opening Br. (Sentencing Order).
[28] *Guy v. State*, 913 A.2d 558, 565 (Del. 2005).
[29] *Id.*

"the ends of public justice would otherwise be defeated." [30] Constitutional questions are reviewed *de novo*. [31]

(10) A *Brady* violation occurs when there is "suppression by the prosecution of evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." [32] This Court has made clear that

> [i]n order for the State to discharge its responsibility under *Brady,* the prosecutor must disclose all relevant information obtained by the police or others in the Attorney General's Office to the defense. That entails a duty on the part of the individual prosecutor "to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." [33]

There are three components of a *Brady* violation: "(1) evidence exists that is favorable to the accused, because it is either exculpatory or impeaching; (2) that evidence is suppressed by the State; and (3) its suppression prejudices the defendant." [34]

---

[30] *Justice v. State*, 947 A.2d 1097, 1100 (Del. 2008).

[31] *Zebroski v. State*, 12 A.3d 1115, 1119 (Del. 2010). A claim that the State has committed a *Brady* violation is a claim that the defendant's right to due process under the Fourteenth Amendment of the United States Constitution has been violated. *Brady*, 373 U.S. at 86-87.

[32] *Brady*, 373 U.S. at 87. We have assumed, as the parties have, that a *Brady* analysis is the proper test to resolve this appeal. If the withheld material is not *Brady* material, the appropriate sanction for a discovery violation is addressed to the sound discretion of the trial judge. *Doran v. State*, 606 A.2d 743, 745 (Del. 1992).

[33] *Wright v. State*, 91 A.3d 972, 988 (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)).

[34] *Wright*, 91 A.3d at 988 (quoting *Starling v. State*, 882 A.2d 747, 756 (Del. 2005)).

(11)   Whether suppression of the evidence caused prejudice to the defendant depends on the materiality of the evidence.  As this Court explained in *Wright v. State*:

> [m]ateriality does not require the defendant to show that the disclosure of the suppressed evidence would have resulted in an acquittal.  Nor is a reviewing court required to order "a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.'" Rather, the defendant must show that the State's evidence creates "a *reasonable  probability* that,  had  the  evidence  been disclosed to the defense, the result of the proceeding would have been different."  A reasonable probability of a different result occurs where the government's evidentiary suppression "undermines confidence in the outcome of the trial."[35]

(12)   Materiality is determined in the context of the entire record.    After an item by item review of the undisclosed evidence, the court separately evaluates the cumulative effect of the suppressed evidence.[36]  "When 'a defendant is confronted with delayed disclosure of *Brady* material, reversal will be granted only if the defendant was denied the opportunity to use the material effectively.'"[37]

(13)   Gray asserts that two statements contained in Detective Pigford's supplemental report qualify as *Brady* material: a) Officer Murphy's statement to Detective Pigford of February 4, 2013, correcting his statement to Detective Pigford of February 3, 2013 as to the number of individuals he chased as they fled

---

[35] *Wright*, 91 A.3d at 988.
[36] *Id*.
[37] *White v. State*, 816 A.2d 776, 778 (Del. 2003) (quoting *Atkinson v. State*, 778 A.2d 1058, 1062 (Del. 2001)).

from the Equinox;[38] and b) Detective Pigford's observation in his report that it "appears that it was probably" a bullet that struck the passenger-side front door of the patrol vehicle "that had struck [Officer] Wilkers."[39]

(14) The existence of the second component of a *Brady* violation, suppression, is undisputed with respect to the statements in the report. The State conceded at trial that it was an oversight not to provide the defense with a copy of Detective Pigford's supplemental report.[40] It is the first and third components, favorability to the defendant and materiality that the State contests with respect to both statements.

Officer Murphy's Inconsistent Statements

(15) Gray argues that Detective Pigford's account of his February 4, 2013 interview of Officer Murphy is favorable to Gray because it is both exculpatory and impeaching. It is exculpatory, according to Gray, because it raises the possibility, contrary to Officer Murphy's previously disclosed statement of the prior day, that Boyce rather than Gray fired the shot that struck Officer Wilkers. Gray also argues that it is impeaching because it demonstrates inconsistent recollection about the incident by a key State witness. Gray contends that a single-

---

[38] Opening Br. at 14; *see* Ex. B to Opening Br. at 13 (excerpt from Detective Pigford's report summarizing his February 4, 2013 interview with Officer Murphy).
[39] Opening Br. at 14; *see* Ex. B to Opening Br. at 15 (excerpt from Detective Pigford's report discussing a bullet that struck the passenger-side front door of the patrol vehicle and asserting that it was probably the bullet that struck Officer Wilkers).
[40] App. to Answering Br. at 62 (Trial Transcript).

night recess did not provide defense counsel with sufficient time to use the evidence effectively, and defense counsel might have altered trial strategy from the beginning to accuse Boyce of being the gunman. The State responds that Officer Murphy's inconsistent statement in Corporal Pigford's report was at most useful to the defense for purposes of impeachment, was made available ahead of Gray's cross-examination of Officer Murphy, and was used effectively by the defense for the purpose of impeachment.

(16) Officer Murphy's recollection in the undisclosed report was arguably favorable to Gray for both exculpatory and impeachment purposes. One possible defense theory, although not one that was pursued based on any other known facts in the case, was to place the blame on another occupant of the SUV. For purposes of creating reasonable doubt as to Gray's guilt, evidence that impeached the other officer's recollection and raised doubts about the reliability of his account of events was favorable to Gray.

(17) Although the interview arguably contained *Brady* material and therefore should have been disclosed, Gray did not suffer prejudice as a result of the State's error. When defense counsel raised the failure to disclose the supplemental report, the Superior Court ordered a recess from 3:15 p.m. January 15, 2013, to 10:53 a.m. the next day.[41] The overnight recess occurred between the

---

[41] *Id.* at 62, 66, 80.

State's direct examination of Officer Murphy and the defense's cross-examination. The next day defense counsel examined Officer Murphy on the inconsistencies between the two interviews.[42] The overnight recess provided defense counsel with sufficient time to make effective use of Officer Murphy's inconsistencies during cross-examination.

(18) Further, neither Officer Murphy nor the State suggested at trial that Boyce was being chased by Officer Murphy when the shots were fired and therefore could not have been the shooter. The State also introduced substantial evidence to establish that it was Gray rather than Boyce who was the shooter. Officer Wilkers testified he made eye contact with Gray when Gray pointed a handgun at Officer Wilkers moments before he was shot.[43] The State played a videotape showing Gray throwing a dark object into the alley where the police found a black 9 millimeter semi-automatic handgun.[44] The State also presented evidence that the bullet that struck Wilkers was a 9 millimeter bullet.[45]

(19) The defense also knew prior to trial that there were inconsistencies in Officer Murphy's recollection of the events of February 3, 2014.[46] They had the ballistics analysis of the State's expert analyzing the trajectories of the bullets.[47] If

---

[42] App. to Answering Br. at 82-86, 102-04.
[43] App. to Answering Br. at 210-12 (Trial Test. of Ofc. Justin Wilkers, Jan. 23, 2014).
[44] State's Tr. Ex. 46.
[45] App. to Answering Br. at 199 (Trial Test. of Carl Rone, Jan. 23, 2014).
[46] App. to Answering Br. at 76 (Trial Transcript).
[47] *Id.* at 77.

the defense thought it was possible to show that Boyce rather than Gray was the gunman, they could have pursued that defense irrespective of a single statement in Officer Murphy's February 3, 2014 interview. Therefore, Gray suffered no prejudice as a result of the State's disclosure of the second interview at trial.

The Possible "Ricochet"

(20) Gray argues that Detective Pigford's speculation about a ricochet striking Officer Wilkers is exculpatory because: (a) it suggests the shot may have come from a direction other than where Gray was standing; and (b) it raises the possibility that the shot was fired blindly and not with the intent needed to convict Gray of attempted murder.

(21) The exculpatory nature of Detective Pigford's statement is dubious. While standing alone this evidence might have some exculpatory potential, it is not reasonably probable that, had the defense earlier received this suggestion of a possible ricochet, the outcome of Gray's trial would have been different. As for Gray being the shooter, the possibility that the bullet that struck Officer Wilkers hit the passenger-side front door of the patrol vehicle before hitting Wilkers is not inconsistent with the State's theory that the bullet was fired by Gray from the passenger side of the Equinox. Regarding intent, the State did not rely on the trajectory of the bullet to prove intent. Rather, according to Officer Wilkers, Gray made eye contact with Officer Wilkers and pointed a gun at Officer Wilkers right

11

before he was shot. The eye contact, followed the pointing of a gun in Officer Wilkers's direction, was sufficient to establish the requisite intent for attempted murder. Therefore, we once again find no prejudice to Gray as a result of the State's disclosure of the second interview at trial.

Shana Gray's Out-Of-Court Statement

(22) Gray's final claim on appeal is that the Superior Court erred when it admitted Shana Gray's out-of-court statement to police under 11 *Del. C.* § 3507. Gray contends that the statement was presumptively involuntary under *Taylor v. State*[48] because Shana Gray was in police custody at the time of the interview and therefore the statement was inadmissible under § 3507. The State argues in response that the statement was voluntary, as established by Ms. Gray's testimony on direct examination where she admitted the statements she made during the interview were voluntary and nobody forced her to talk to Detective Pigford.[49] This Court reviews a trial court ruling on the admissibility of a witness's out-of-court statement under § 3507 for an abuse of discretion.[50]

(23) Under 11 *Del. C.* § 3507, "the voluntary, out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value." Following

---

[48] 23 A.3d 851 (Del. 2011).

[49] Answering Br. at 25; *see* App to Answering Br. at 156 (Trial Test. of Shana Gray, Jan. 17, 2015).

[50] *Wyche v. State*, 113 A.3d 162, 165 (Del. 2015).

completion of briefing on appeal, this Court decided *Wyche v. State*, where we reaffirmed that, generally, the "totality of the circumstances" test is applied by the trial court to determine the voluntariness of a witness statement admitted under § 3507:

> Because custodial interrogations have an inherently coercive quality, the absence of certain procedural safeguards, including *Miranda* warnings, can render a custodial statement by a Section 3507 witness involuntary but only under very limited circumstances. Generally, however, Delaware courts take a "totality of the circumstances" approach in determining whether the witness' "will was overborne" such that the proffered Section 3507 statement was not "the product of a rational intellect and a free will." "A totality of the circumstances approach ... requires the reviewing court to consider the specific tactics utilized by the police in eliciting the admissions, the details of the interrogation, and the characteristics of the defendant." The factors that bear on these circumstances include:
>
>> the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.[51]

(24) We have assumed for purposes of Gray's argument that his mother was in custody because, according to Shana Gray's uncontradicted account on *voir dire* examination, she was told that she had to accompany police to the station and

---

[51] *Id.* at 165-66 (*citing Taylor,* 23 A.3d at 855–56 (Del. 2011) and quoting *State v. Rooks*, 401 A.2d 943, 949–50 (Del.1979) and *Baynard v. State*, 518 A.2d 682, 690 (Del.1986) (*quoting Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973))).

could not leave once there.[52] Gray is correct that in *Taylor v. State* the Court held that custodial interrogations are presumptively involuntary where *Miranda* warnings are not given to the witness.[53] But in *Wyche* we limited the "narrow" ruling of *Taylor* to the specific facts of that case, where "a Section 3507 witness was falsely told he was under arrest for the very crime about which he gave the unwarned statement sought to be introduced under Section 3507."[54] No such extreme circumstances are presented here. Therefore the proper test to determine voluntariness in this case is the totality of the circumstances test.

(25)  The trial judge conducted *voir dire* and determined that Shana Gray's statement to police was voluntary based on her testimony that her statements to police were voluntary and not coerced.[55] Ms. Gray is an adult, was not threatened with being charged with a crime, and our review of the videotape of the questioning shows no extreme duress or inappropriate interrogation tactics such that her will was overborn. The trial judge did not abuse his discretion to admit into evidence Shana Gray's testimony under § 3507.

---

[52] App. to Answering Br. at 158 (*voir dire* examination of Shana Gray, Jan. 17, 2014).
[53] *Taylor*, 23 A.3d at 855.
[54] *Wyche*, 113 A.3d at 166.
[55] App. to Answering Br. at 157-59 (Trial Transcript).

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

*/s/ Collins J. Seitz, Jr.*
Justice
