NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0104n.06

No. 11-6224

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
***Jan 30, 2013***
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| Plaintiff-Appellee, | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| v. | ) | |
| | ) | O P I N I O N |
| DANIEL MOHAMMED, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:  McKEAGUE and GRIFFIN, Circuit Judges; and DLOTT, District Judge.[*]

**DLOTT, District Judge.**  Defendant-Appellant Daniel Mohammed entered a conditional guilty plea to being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g) and 924, reserving the right to appeal the district court's denial of his motion to suppress physical evidence seized from his person and statements he made during the execution of an arrest warrant for another individual with whom Mohammed was found.  He now exercises that right, and for the reasons that follow, we affirm.

## I.  BACKGROUND

The relevant facts of this case are not disputed.  During the early morning hours of July 26, 2010, four Metropolitan Nashville Police Officers — Brandon Frith, Brent Bauer, David Boone, and J.D. Young — set out to execute an arrest warrant for DeAndre Howard.  The officers hoped to find

---

[*]Honorable Susan J. Dlott, Chief United States District Judge for the Southern District of Ohio, sitting by designation.

Howard at his residence, 5104 Colemont Drive, Nashville, Tennessee. As the officers entered the property and approached the residence, they saw two motionless figures slumped in chairs in the front yard. Using their flashlights, the officers saw that the chairs were occupied by two men of similar appearance, build, and hairstyles, both fitting the general description of Howard. As the officers later would learn, those men were Howard and Mohammed.

The officers attempted to alert the men to their presence by shining their flashlights on them and announcing "police" several times. However, neither man responded. As the officers cautiously continued their approach, they noticed empty forty-ounce beer bottles scattered beside each of the men, indicating the men had been drinking. Once they were about five or six feet away, Officer Bauer saw in plain view a gun lying on Mohammed's lap, and he alerted the other officers to its presence. The officers continued to shout at the men in an attempt to rouse them. However, the men still gave no indication that they heard the police.

Having tried and failed to wake them, the officers moved in closer. Officer Frith grabbed the gun from Mohammed's lap, and then the officers put both men flat on the ground and handcuffed them. By that time, Mohammed had awakened. According to Officers Frith and Bauer, Mohammed smelled of alcohol, was slow to respond, and appeared confused and disoriented.

After separating Howard and Mohammed, Officer Boone confirmed Howard's identity and placed him under arrest pursuant to the warrant while Officer Young performed a pat-down of Mohammed to check for additional weapons.[1] Mohammed asked Officer Young what was going

---

[1] During the suppression hearing, Officer Young testified that one of the reasons for that pat-down was that officers assume that individuals who are found with one or more weapons may be carrying

on, and Officer Young told him that the officers had found him with a gun in his lap. At that time, Mohammed denied having the gun, though later he would admit to possessing it. During the pat-down, Officer Young found a small baggy of marijuana, a holster fitting the gun recovered from Mohammed's lap, and a wallet containing Mohammed's identification card ("ID"). Prior to retrieving Mohammed's ID, Officer Young had not asked Mohammed for his name, and he had no knowledge of Mohammed's identity.

After Officer Young finished the pat-down, Howard's mother emerged from the residence. Because she was angry and tensions were rising, the officers decided to move Howard and Mohammed to a different location. They placed Mohammed in Officer Frith's patrol car and he was transported to the parking lot of an elementary school that was approximately one block from the residence. Once parked outside of the school, Officer Young performed a background check using Mohammed's ID. That search revealed that Mohammed was a convicted felon. Accordingly, the officers arrested Mohammed for being a felon in possession of a firearm. While still in the parking lot, Officer Young advised Mohammed of his rights, and Mohammed agreed to answer questions regarding his possession of the gun. Officer Young interrogated Mohammed using his department's gun arrest questionnaire, which is administered to anyone who is arrested with a handgun. In the course of the interrogation, Mohammed indicated that he had received the gun from Howard and that he had possessed the gun for about thirty minutes. During the short interrogation, Officer Frith

additional weapons.

called the records department to perform a background check on the gun they had retrieved from Mohammed, and he learned that the gun had been reported as stolen.

Mohammed subsequently was indicted by a federal grand jury for unlawful possession of a firearm as a convicted felon. Following his indictment, Mohammed moved to suppress the physical evidence found during the search of his person and the incriminating statements he made after he was detained, claiming that he was the subject of an improper *Terry* detention, that police lacked probable cause to arrest him, and that his *Miranda* rights were violated. He did not argue then, nor does he argue now, that his name or identity was subject to suppression. The district court held an evidentiary hearing on Mohammed's motion, during which Officers Frith, Young, and Bauer testified.

At the conclusion of the evidentiary hearing, the district court made an oral ruling denying Mohammed's motion to suppress. The court found that the officers were lawfully on the premises of Howard's residence during the execution of the arrest warrant, that the firearm taken from Mohammed was observed by the officers in plain view and properly seized, that the officers' detention of Mohammed for the purpose of conducting further investigation into the firearm was legitimate, and that the officers were justified in handcuffing Mohammed during that detention. The district court also found that Mohammed was properly arrested after the discovery that he was a convicted felon.

As to the legality of the search of Mohammed's person, which resulted in the discovery of the gun holster, marijuana, and Mohammed's wallet, the district court concluded that because the search took place before the officers determined that Mohammed was a convicted felon, the search

occurred too soon. Though not articulated by the court, implicit in the court's conclusion was the finding that whether that search was characterized as a full search or a weapons pat-down, the search exceeded the scope of what would have been permitted under *Terry*. The district court nonetheless declined to suppress the evidence seized during that search. Instead, the court invoked the inevitable discovery doctrine, finding that because Mohammed ultimately was arrested for being a felon in possession of a firearm, the officers would have discovered the evidence in question during a lawful search incident to his arrest. The district court further found that Mohammed's admissions were admissible because he had properly waived his *Miranda* rights and his statements were made voluntarily. Mohammed subsequently pled guilty to the one count indictment for being a felon in possession of a firearm, reserving for appeal the district court's denial of his suppression motion. On October 6, 2011, the district court sentenced Mohammed to forty months' incarceration.

## II. ANALYSIS

On appeal, Mohammed argues that the district court erred in invoking the inevitable discovery doctrine as the basis for denial of his motion to suppress, given that the court's basis for applying that doctrine was that the officers inevitably would have discovered Mohammed to be a convicted felon and would have searched Mohammed incident to his arrest for felon in possession of a firearm. Mohammed claims that there is no evidence in the record to support a finding that had the unlawful search not occurred, the officers would have discovered either Mohammed's identity or his felony status. Accordingly, Mohammed argues, his arrest for felon in possession of a firearm and any attendant search was not inevitable. Finally, Mohammed also argues that his confession falls beyond the inevitable discovery doctrine because the Government has not shown that

Mohammed inevitably would have made the same statements had he been arrested under different circumstances.

We review a district court's decision on a suppression motion for clear error as to factual findings and de novo as to conclusions of law. *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004). If the district court denied the motion to suppress, "we must view the evidence in the light most favorable to the government." *United States v. Smith*, 549 F.3d 355, 359 (6th Cir. 2008) (internal quotation marks omitted). The applicability of the inevitable discovery exception to this case is a mixed question of law and fact, which we review de novo. *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002).

As we have described previously, the inevitable discovery doctrine is an exception to the exclusionary rule, which "prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)). The inevitable discovery doctrine "allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." *Id*. (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). In approving the inevitable discovery exception, the Supreme Court reasoned that "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings." *Nix*, 467 U.S. at 447.

When considering whether the inevitable discovery doctrine should shield from exclusion evidence and information obtained through or as a result of an unlawful search, a court must "'determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred.'" *Kennedy*, 61 F.3d at 498 (quoting *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992), *cert. denied*, 510 U.S. 1045 (1994)). In *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999), this Court explained that the doctrine is applicable where the evidence demonstrates that "routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." "Though some speculation as to how events would have unfolded, absent an illegal search, may be necessary, 'we must keep speculation at a minimum by focusing on demonstrated historical facts capable of ready verification or impeachment.'" *United States v. Lazar*, 604 F.3d 230, 240 (6th Cir. 2010) (quoting *Ford*, 184 F.3d at 577).

### A.      The Physical Evidence

In the present case, the district court determined that the search of Mohammed's person exceeded the scope of a valid pat-down. The physical evidence Mohammed seeks to suppress — his wallet, the marijuana, and the gun holster — were fruits of the unlawful search and as such would have been subject to suppression had the district court not applied the inevitable discovery doctrine or one of the other exceptions to the exclusionary rule.[2]  *See United States v. Howard*, 621 F.3d 433, 451 (2010). Mohammed claims that the district court's analysis was flawed because the judge did

---

[2] The officers may have been entitled to seize the holster under the plain-feel doctrine. However, that issue was not explored during the evidentiary hearing before the district court, and as a result, there is no testimony in the record that would support such a finding.

not view the affairs as they existed prior to the search, but rather relied on information obtained during the search, specifically Mohammed's identity, to determine that the officers inevitably would have discovered that he had a felony record and then would have arrested him for being a felon in possession. To the contrary, Mohammed argues, there is no evidence that the officers would have discovered his true identity had they not seized his wallet and ID during the unlawful search. He maintains that had the officers merely asked him for his name and ID, he could have claimed credibly to be someone else and could have denied possession of an ID. Had the officers not discovered his true identity, they may not have learned that he was a convicted felon, and may not have arrested him. The Government responds that even if the officers had not discovered Mohammed's true identity or that he had a felony record, they had probable cause to arrest him for at least three other crimes under Tennessee law based on information derived from plain view observations, the proper seizure of the gun, and other circumstances that arose during Mohammed's seizure.[3]

Even if, as Mohammed claims, the district court erred in its analysis when applying the inevitable discovery doctrine, we may affirm the district court's denial of Mohammed's motion on any grounds supported by the record. *See United States v. Davist*, 481 F.3d 425, 427 (6th Cir. 2007). In this case, the record supports the conclusion that had the unlawful search not occurred, the officers

---

[3] According to the Government, the three additional crimes for which the officers had probable cause to arrest Mohammed are: possession of a firearm while under the influence of alcohol, in violation of Tennessee Code § 39-17-1321; unlawful possession of a firearm with intent to go armed, in violation of Tennessee Code § 39-17-1307(a)(1); and theft by way of receiving stolen property, in violation of Tennessee Code §§ 39-14-101 and 39-14-103.

nevertheless would have arrested Mohammed for theft by way of receiving stolen property in violation of Tennessee Code § 39-14-103.[4]

The facts known to the officers upon first detaining Mohammed included that he appeared to have been drinking and to have passed out in a lawn chair with a loaded gun resting in plain view in his lap. Mohammed does not dispute that once the officers discovered that the gun was stolen, they had probable cause to arrest Mohammed for the crime of theft. Rather, seizing on the fact that the officers did not run a check on the gun until after Mohammed had been arrested and transported to the nearby school, Mohammed argues that it was not inevitable that the officers would have run a background check on the gun had they not searched Mohammed and then arrested him for being a felon in possession of a firearm.

When asked why the officers continued to detain Mohammed after disarming him, Officer Young testified as follows:

A. We were trying to ascertain whether or not he had a legal right – I mean, I understand he's on private property, and there's nothing wrong with that whatsoever, but I don't know very many people that will, you know, carry a pistol like that in their lap and fall asleep with it.

Q. So did your investigation include determining whether he had a permit to carry this gun or whether he was prohibited because of the felony or some other reason for having a gun?

A. Correct, and also to – I mean, it's not uncommon to, where if we do run across a gun, just to, you know, check to see if the pistol is stolen because that happens quite some time, too.

---

[4] Tennessee Code § 39-14-103(a) provides, "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent."

R. 46, Supp. Hr'g Tr., Page ID # 328. Focusing only on the last portion of that testimony, Mohammed argues that Officer Young's statement that officers *sometimes* check to see if a gun is stolen does not sufficiently prove that the officers in this case *would* have run a background check. However, when viewed in the context of the surrounding statements, Officer Young's statement indicates that one of the reasons the officers continued to detain Mohammed was that they in fact planned to check if his gun was stolen as part of a general investigation into whether there was any reason why Mohammed would be prohibited from possessing that gun. The officers performed both the background check into Mohammed's criminal history and the check of the gun within a relatively short time period after detaining Mohammed. It was mere happenstance that they determined he was a convicted felon and arrested him on that basis before learning that the gun was stolen. With minimal, if any, speculation as to how the events would have unfolded, Officer Young's testimony is sufficient to demonstrate that even if the officers had never discovered Mohammed's true identity and criminal history, they nonetheless would have done a routine check on the gun, would have discovered it was stolen, and thereafter would have arrested Mohammed for possession of the stolen gun.

Because there is sufficient evidence in the record that the officers lawfully would have arrested Mohammed for possession of a stolen gun based on information discovered independent of the unlawful search, the district court's ultimate conclusion that the officers would inevitably have found the physical evidence Mohammed seeks to suppress during a search incident to arrest is sound, and the court did not err in applying the inevitable discovery exception to that evidence. *See United States v. McGlown*, 150 F. App'x 462, 467–68 (2005) (holding that cocaine found in the defendant's

pocket would have been seized inevitably where probable cause existed for officers to arrest the defendant for carrying a concealed weapon and for reckless discharge of a firearm and where following routine procedures, once the defendant was placed under arrest, the officers would have discovered the cocaine during a search incident to the arrest).

### B.     Mohammed's Statements

Mohammed next argues that even if the physical evidence inevitably would have been discovered by lawful means, his confession falls beyond the inevitable discovery doctrine because the Government has not shown that Mohammed would have made the same statements had he been arrested under different circumstances.

Mohammed relies heavily on *United States v. Vasquez De Reyes*, 149 F.3d 192, 195–96 (3d Cir. 1998), in which the Third Circuit expressed concern that the intangible nature of statements make them a poor candidate for application of the inevitable discovery doctrine.[5]  Distinguishing

---

[5] In *Vasquez De Reyes*, INS agents investigating a tip that three female illegal aliens would be at a local bar in the Virgin Islands stopped and questioned Belki Maria Vasquez De Reyes, a resident of the Dominican Republic who claimed she was legally present in the Virgin Islands under a visa. *Id*. at 193.  Ms. De Reyes produced papers showing that she was married to Escolastico De Reyes, a resident of the Virgin Islands, but she was unable to produce a document showing she was legally present in the United States.  Accordingly, Ms. De Reyes was incarcerated overnight.  The next morning, Mr. De Reyes arrived at INS headquarters looking for his wife, and he was questioned by an agent about his marriage.  He maintained that Ms. De Reyes was his wife. However, when the agent subsequently visited Mr. De Reyes' home, he became suspicious as to whether the Ms. De Reyes actually lived there because there were very few articles of women's clothing in the home. As a result of that discovery, Mr. De Reyes' mother told the agent that Ms. De Reyes did not live with Mr. De Reyes.  That admission led Mr. De Reyes to confess that the De Reyes' marriage was a fraud that had been established to enable Ms. De Reyes to obtain a permanent resident card.  When Ms. De Reyes was confronted with the information about her husband's confession and the visit by the INS to his home, she too conceded the fraudulent nature of the marriage. *Id*.
       After her arrest, Ms. De Reyes filed a motion to suppress all evidence of items and statements taken from her and obtained pursuant to the initial stop outside the bar on the basis that the INS

statements from physical evidence, the court noted that when circumstances change "even but a little," there is "no assurance" that a suspect would make the same statements. *Id*.

Though mindful of the concerns stated by the Third Circuit, the evidence in this case shows the circumstances leading to Mohammed's statements would have been substantially unchanged had Mohammed been arrested on the basis that the gun was stolen instead of on the basis of his felony record. The testimony elicited at the suppression hearing indicates that the officers would have administered the same gun arrest questionnaire that they use with "anyone that's arrested with a handgun." R. 46, Supp. Hr'g Tr., Page ID # 331. Given that Mohammed would have been asked the same questions under substantially similar circumstances, it is highly likely he would have made materially similar answers. We therefore find that like the physical evidence, the inevitable discovery exception also applies to Mohammed's statements.

## III. CONCLUSION

For these reasons, we AFFIRM.

---

agents lacked reasonable suspicion to hold and question her. The district court found the stop to be unlawful, but nonetheless concluded the testimonial evidence was admissible under the inevitable discovery doctrine based on testimony that the statements would have been inevitably discovered through a routine INS investigation of the De Reyes marriage even if the stop never had occurred. *Id*.

The Third Circuit reversed, holding that the government failed to prove that but for the initial illegal detention, the confessions would have been obtained. *Id*. at 196. The court noted that evidence provided no assurance that an ordinary interview and home visit by INS agents actually would have taken place or that such a visit would yield the same confession, particularly given that under ordinary circumstances, the De Reyes would have had notice of the visit and could have prepared for it. *Id*.