IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,      )
      )
    v.      )   I.D. No. 2003009148
      )
AARON GARNETT,      )
     Defendant.      )
      )

Submitted: January 14, 2022
Decided: March 1, 2022

## MEMORANDUM OPINION AND ORDER

### *Upon Defendant's Deferred Motion to Suppress Statement*
### DENIED

Jason C. Cohee, Esquire, and Kristin M. Dewalt, Esquire, Department of Justice, Dover, Delaware, *Attorneys for the State.*

Robert A. Harpster, Esquire, and Cara M. Brophy, Esquire, Office of Defense Services, Dover, Delaware, *Attorneys for Defendant.*

**Primos, J**.

This is the Court's decision on whether to suppress the taped statement of Defendant Aaron Garnett (hereinafter "Garnett"), as deferred in the Court's previous decision in *State v. Garnett* (hereinafter "*Garnett I*").[1] The Court will not repeat the entire factual summary from *Garnett I*, but will touch on pertinent facts from that decision, as well as additional facts related during the subsequent Rule 104(a) hearing that are relevant to the Court's analysis.[2]

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

This matter arises from an incident that occurred on March 15, 2020. Shortly after 5:40 a.m., the Dover Police Department (hereinafter the "Dover PD") was contacted by an employee of the Wawa store located at 1450 Forrest Avenue in Dover who had allegedly witnessed a domestic violence incident between Garnett and a child.[3] The bare details given to the officers were that Garnett had grabbed the throat of a child who appeared to be accompanying him, which would be confirmed through Wawa's video surveillance and a scratch on the child's neck.[4] When the officers arrived on scene, Garnett gave them false information regarding his name, and he was arrested for criminal impersonation.[5] In addition, Garnett was under suspicion for grabbing the neck of the child.[6]

---

[1] 2021 WL 6109797 (Del. Super. Dec. 23, 2021).
[2] The original suppression hearing was held on December 3, 2021, *Garnett I* was issued on December 23, 2021, and the Rule 104(a) hearing was held on January 14, 2022.
[3] *Id.* at *1.
[4] *Id.* at *1, *2.
[5] *Id.*
[6] *Id.*

Simultaneously with the questioning of Garnett, officers spoke with two of the three children,[7] F.L and M.S., and provided them with refreshments.[8] M.S. told the officers that Garnett had awakened him and the other two children to take a long walk without giving them any justification.[9] The officers asked F.L. and M.S. for their home address, to which M.S. replied "Willis Road" and F.L. replied "32."[10] F.L and M.S. also advised the officers that their mother was at home sleeping.[11]

Subsequently, three of the seven officers who had arrived on scene at the Wawa proceeded to 32 Willis Road to locate the mother of the children.[12] In *Garnett I*, this Court determined that those officers made an illegal entry into the home. All officers questioned at the original suppression hearing who were part of the entry indicated that the sole purpose of the home visit was to locate the children's mother, with some additional concern that she was not answering the door after approximately five minutes.[13] Therefore, the State did not meet its burden to show that the emergency doctrine was applicable. However, the State did show that the body of Naquita Hill (hereinafter "Ms. Hill") and other physical evidence in the home would inevitably have been discovered through routine police procedures shortly after the warrantless entry.[14]

In *Garnett I*, the Court deferred judgment on whether Garnett's statements made in a custodial interrogation with two detectives, subsequent to the warrantless

---

[7] The three children were as follows: 1) M.S.—ten years old; 2) F.L.—five years old; and 3) A.G.—five months old. *Id.* The Court will refer to the minors by their initials. *Cf.* Delaware Supreme Court Rule 10.2(9)(b) ("Names of minor children. If the involvement of a minor child must be mentioned, only the initials of that child should be used.").
[8] *Garnett I*, 2021 WL 6109797, at *1.
[9] *Id.* at *2.
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.* at *2–*3.
[14] *Id.* at *7.

entry, would be suppressed. At that time, the Court did not have enough facts to understand when and how Garnett's confession was obtained relative to the warrantless entry.

At the subsequent Rule 104(a) hearing, Detective Timothy Mullaney testified for the State. Detective Mullaney relayed much of the factual background already discussed *supra*, and in addition provided the Court with detailed times for the pertinent events of March 15, 2020, leading up to Garnett's interrogation:

1) Officers were dispatched to 32 Willis Road at approximately 6:26 a.m.

2) Officers discovered Ms. Hill's body at 6:42 a.m.

3) At approximately 6:42 a.m., give or take a few minutes, M.S. told the officer that Garnett had instructed him to "hide" Ms. Hill's Social Security card and driver's license in his pocket.

4) At approximately 6:42 a.m., give or take a few minutes, Garnett was discovered to have a bloody sock during processing.

3) Paramedics arrived on scene at approximately 6:50 a.m.

4) A search warrant was executed at 10:40 a.m.

5) Garnett's questioning by the two detectives began at 2:00 p.m.

In addition to the more detailed time frames, Detective Mullaney stated that the children, irrespective of whether the body was found, would have likely undergone Child Advocacy Center (hereinafter "CAC") interviews that would have extended Garnett's custody. Secondly, Detective Mullaney confirmed that Garnett, irrespective of whether the body was found, was being investigated for the domestic incident at Wawa, which again would likely have extended his custody.

As mentioned *supra*, Garnett's statement began at 2:00 p.m. on the same day he was arrested for criminal impersonation. The questioning was conducted by two

4

detectives, Detective Mullaney and Detective Chris Bumgarner. At the beginning, the detectives asked Garnett general questions regarding his identity.[15] Shortly after the beginning of the interrogation, Detective Mullaney stated that he wanted Garnett to tell them what led to his walking to the Wawa with the three children in the early morning hours, and he also told Garnett that officers had been to 32 Willis Road.[16] Garnett responded that he wanted to tell the detectives a "story."[17] He stated that he had come home and had found Ms. Hill's dead body, but that he had played no role in her death and had been shocked by it.[18]

Subsequently, the detectives told Garnett that a journal found on his person following his arrest, which belonged to Ms. Hill, indicated potential trouble with the relationship.[19] Approximately an hour into the interview, Detective Bumgarner pleaded with Garnett "do the right thing." Garnett then admitted that he "did do that shit[20] . . . [that he] lost [his] temper for real[21]. . .[and] [he] got mad and [he] choked her."[22]

## II. STANDARD

For a motion to suppress evidence obtained in violation of the Fourth or Fifth Amendment, the State bears the burden of showing that the seizure of the evidence complied with the requirements of the United States Constitution, the Delaware

---

[15] State's Ex. A, Video Interview of Garnett, at 3:52–6:30 (referring to time references from videorecording of statement).

[16] Detective Mullaney did not tell Garnett that officers had entered the home, nor did he mention anything about the evidence discovered there. *Id.* at 6:31–6:52.

[17] *Id.* at 6:52–6:53.

[18] *Id.* at 7:54–7:58, 16:45–17:22.

[19] *Id.* at 31:53–31:55.

[20] *Id.* at 44:45–44:47.

[21] *Id.* at 44:55–44:57.

[22] *Id.* at 45:15–44:18.

Constitution, and any applicable statutes.[23]  In a suppression hearing, the Court sits as the finder of fact and evaluates the credibility of the witnesses.[24]  The State's burden is to establish the legality of the challenged seizure by a preponderance of the evidence.[25]

### III. DISCUSSION

#### A. Voluntariness

Initially, it is important to note that the voluntariness of Garnett's statement is a "threshold requirement" to its admissibility as substantive evidence.[26]  Pursuant to 11 *Del.* C. § 3507, a witness's prior statement can only be used as affirmative evidence at trial if it is voluntary.  When the totality of the circumstances demonstrate that the witness' will was "overborne," the statement is deemed involuntary.[27]  The Delaware Supreme Court has recognized several factors indicating that a statement is involuntary:

> 1) failure to advise the witness of his constitutional rights; 2) lies "about an important aspect of the case ..."; 3) threats that the authorities will take the witness's [sic] child away; 4) extended periods of detention without food; and 5) extravagant promises or inducements.[28]

The Court has reviewed Garnett's videotaped statement and finds that none of these elements is present.  There was no coercion by the officers, and Garnett's

---

[23] *State v. Roundtree*, 2017 WL 4457207, at *2 (Del. Super. Oct. 4, 2017) (citing *State v. Lambert*, 2015 WL 3897810 at *3 (Del. Super. 2015), *aff'd*, 149 A.3d 227 (Del. 2016)).  Specific to the Fifth Amendment, "[t]he State bears the burden of proving both a right to silence waiver and the voluntariness of a confession." *Garvey v. State*, 873 A.2d 291, 296 (Del. 2005) (citations omitted).

[24] *State v. Bordley*, 2017 WL 2972174, at *2 (Del. Super. July 11, 2017) (citing *State v. Hopkins*, 2016 WL 6958697, at *2 (Del. Super. Nov. 28, 2016)).

[25] *Lambert*, 2015 WL 3897810, at *3; *State v. Rooks*, 401 A.2d 943, 949 (Del. 1979) (finding that the State must prove "voluntariness [of a confession] . . . by at least a preponderance of the evidence" (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972))).

[26] *Brown v. Illinois*, 422 U.S. 590, 604 (1975).

[27] *Taylor v. State*, 23 A.3d 851, 853 (Del. 2011).

[28] *Id.* (internal citations omitted).

statements came of his own free will. Garnett was advised of his constitutional rights and all *Miranda* procedural safeguards were followed.[29] Garnett clearly waived such rights.[30] Near the beginning of the interrogation, Garnett quickly indicated to the officers that he wanted to tell them a story.[31] The officers did not lie about any part of the case, and furthermore they did not mention any evidence found at 32 Willis Road, including Ms. Hill's body. There were no threats by the officers during the questioning, and no evidence was presented to this Court that Garnett faced "extended periods of detention without food." In addition, there were no promises made by the detectives to Garnett, and no inducements of any kind. Thus, the Court deems the statement voluntary, and that Garnett waived his constitutional rights voluntarily, knowingly, and intelligently.

## B. Relevant Exceptions to the Exclusionary Rule

The Delaware Supreme Court has recognized exceptions to the exclusionary rule where "official misconduct [does] not fatally taint evidence that would have been discovered absent that official misconduct."[32] The two primary exceptions to "purge" the "taint"[33] relevant here are the inevitable discovery doctrine and the attenuation doctrine.[34]

---

[29] State's Ex. A, at 6:00–6:25.

[30] *Id.*

[31] *Id.* at 6:52–6:53.

[32] *Jones v. State*, 745 A.2d 856, 873 (Del. 1999)

[33] *See Lopez-Vazquez v. State,* 956 A.2d 1280, 1292 (Del. 2008) ("[T]aint may be purged and the evidence may be admissible through one of the doctrinal exceptions to the exclusionary rule, such as the independent source doctrine, the inevitable discovery doctrine, the exigent circumstances doctrine, and the attenuation doctrine.").

[34] The inevitable discovery doctrine was explained in *Garnett I.* The attenuation doctrine exception to the exclusionary rule "permits courts to find that the poisonous taint of an unlawful search and seizure has dissipated when the causal connection between the unlawful police conduct and the acquisition of the challenged evidence becomes sufficiently attenuated." *Lopez-Vasquez*, 956 A.2d at 1293 (citations omitted).

The only case cited by Garnett in his briefing as to this issue is *United States v. Vasquez De Reyes*,[35] upon which Garnett relies heavily. In *Vasquez De Reyes*, the defendant had confessed while being illegally detained by INS agents in connection with an investigation involving fraudulent permanent residency cards.[36] In that case, the Third Circuit held that statements made by the defendant and her putative husband were not admissible under the inevitable discovery doctrine.[37] However, in a footnote the Third Circuit also relied on the attenuation doctrine, stating that the government "has not shown that the statements were the result of an 'act of free will unaffected by the initial illegality.'"[38] Thus, it would appear that the Court considered the inevitable discovery doctrine and the attenuation doctrine in tandem with one another.

A crucial factual distinction between this case and *Vasquez De Reyes* is that Garnett had been lawfully arrested at the time of his confession. Therefore, the illegality was not that the detainment was illegal, as in *Vasquez De Reyes*, but that illegally obtained evidence (i.e., the discovery of Ms. Hill's body and other physical evidence in the home) could potentially have been exploited to provoke Garnett's confession. Thus, as the Court noted in *Garnett I*, the proper inquiry here is whether "the State [has met] its burden under *Wong Sun v. United States* and show[n] that

---

[35] 149 F.3d 192 (3d Cir. 1998).

[36] *Id.* at 193.

[37] *Id.* at 195.

[38] The footnote reads, in part, as follows:

> This case is closer to *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), where the Court held that the prosecution had failed to meet its burden under *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), to show that the confession at issue was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." Here also, the government has not shown that the statements were the result of an "act of free will unaffected by the initial illegality." *Brown,* 422 U.S. at 603, 95 S.Ct. 2254.

*Id.* at 194 n.1.

Garnett's confession is 'sufficiently an act of free will to purge the primary taint of the unlawful invasion.'"[39]

However, assuming *arguendo* that both doctrines are in play, the Court will analyze this case under both the inevitable discovery doctrine and the attenuation doctrine, as did the *Vasquez De Reyes* court, to determine whether the taint from the warrantless entry was purged prior to the confession.[40]

**1. Garnett's statements are admissible under the inevitable discovery doctrine.**

Under the inevitable discovery doctrine, a court may admit "illegally obtained evidence if the evidence would inevitably have been discovered through independent, lawful means."[41] In other words, "[i]t is the government's burden to show that the evidence at issue would have been acquired through lawful means, a burden that can be met if the government establishes that the police, following routine procedures, would inevitably have uncovered the evidence."[42] For inevitable discovery to apply to a confession, the State must show, *inter alia*, by a preponderance of the evidence, that "the circumstances leading to [Garnett's] statements would have been substantially unchanged."[43]

---

[39] *Garnett I*, 2021 WL 6109797, at *7 n. 39 (quoting *Wong Sun*, 371 U.S. at 487).

[40] It is clear that Garnett's statements were not obtained during a period of illegal custody or interrogation. Garnett had been lawfully arrested for criminal impersonation for the reasons set out in *Garnett I*. In addition, Garnett was under investigation, as indicated by the officers on the scene, for domestic violence towards a child, M.S., as evidenced by the video footage at Wawa, Wawa employees' eyewitness statements, and evidence of injury on M.S.'s neck. Regardless of the illegal search, officers discovered the bloody sock on Garnett's person, as well as the victim's Social Security card and license in F.L.'s pocket that Garnett had told the child to "hide," nearly simultaneously with the illegal entry, which along with the findings mentioned *supra*, would have justified extension of the police custody of Garnett.

[41] *Norman v. State*, 976 A.2d 843, 859 (Del. 2009).

[42] *Vasquez De Reyes*, 149 F.3d at 195.

[43] *United States v. Mohammed*, 512 F. App'x 583, 590 (6th Cir. 2013).

9

At the outset, the Court notes that the inevitable discovery doctrine is an available exclusion for testimonial evidence in Delaware.[44]  Unlike some other jurisdictions, Delaware has not applied a *per se* bar to applying the inevitable discovery doctrine to testimonial evidence.[45]  In *Norman v. State*, the Delaware Supreme Court specifically applied the inevitable discovery doctrine to testimonial evidence given in a psychiatric exam when the defendant was not afforded his right to counsel.[46]

To support his position on suppression, as mentioned *supra*, Garnett referred the Court to the language in *Vasquez De Reyes* observing that "a statement not yet made is, by its very nature, evanescent and ephemeral.  Should the conditions under which it was made change, even but a little, there could be no assurance the statement would be the same."[47]  However, this language suggests a nearly impossible framework for allowing admission of a confession under the inevitable discovery doctrine.  Courts that have cited to *Vasquez De Reyes*, even in light of the quoted language, have been wary of adopting such a rigid application.[48]

---

[44] *See Norman*, 976 A.2d at 859 (admitting defendant's statements taken in violation of his right to counsel under the inevitable discovery doctrine).

[45] *See, e.g.*, *State v. Lopez*, 896 P.2d 889, 910 (Haw. 1995) ("Thus, because we believe that applying the 'inevitable discovery' doctrine to oral statements, including confessions and consents to search, would amount to 'surmise and speculative inference' . . . beyond that in which we are willing to engage at the expense of our constitution, we hold that it only applies to the admissibility of tangible physical evidence.").  *But cf. Wong Sun,* 371 U.S. at 486 (reasoning that "the policies underlying the exclusionary rule [do not] invite any logical distinction between physical and verbal evidence"); *Vasquez De Reyes,* 149 F.3d at 195 (noting that "we know of no articulation of the inevitable discovery doctrine that restricts its application to physical evidence").

[46] *See Norman*, 976 A.2d at 860–861 ("To the extent Dr. Mechanick based his opinion on his review of the history given by Norman to his own psychiatric experts and his interviews with Norman in Delaware, Norman's statements would inevitably have been discovered during the course of a lawful investigation. . . .[T]his case would have been no different even if Norman had the benefit of Delaware counsel at Dr. Mechanick's evaluation.").

[47] *Vasquez De Reyes,* 149 F.3d at 196.

[48] *See, e.g.*, *Mohammed*, 512 F. App'x at 590 ("Though mindful of the concerns stated by the Third Circuit [in *Vasquez De Reyes*], the evidence in this case shows the circumstances leading to Mohammed's statements would have been substantially unchanged . . . [g]iven that Mohammed

The Third Circuit's language must be viewed in light of the factual background of *Vasquez De Reyes*. As mentioned *supra*, in *Vasquez De Reyes,* the defendant was illegally detained by INS agents in connection with an investigation involving fraudulent permanent residency cards. Following her detainment, the defendant was asked questions pertaining to her citizenship. She admitted that she was a citizen of the Dominican Republic but claimed that she was legally present in the Virgin Islands.[49] Thereafter, she was incarcerated. When the defendant's putative husband went to INS headquarters "looking for his wife," he was questioned by agents about his marriage.[50] They subsequently detained him, and the agents went to the putative husband's home, "where they observed very few articles of women's clothing." The putative husband's mother informed the agent that the defendant did not in fact live at the home. When confronted with this information, the putative husband confessed that the marriage was a fraud for the purpose of allowing the defendant to obtain a permanent citizenship card.[51] Subsequently, when the defendant was confronted with her putative husband's confession, she also confessed.[52] In *Vasquez De Reyes,* the taint was the illegal detainment of the defendant, and the State had to prove that had normal procedures been followed, the marriage sham would have come to light.

Hence, the speculative elements involved in *Vasquez De Reyes* would have required the Third Circuit to find that (1) "[the defendant] would have filed her I–485 form without having taken any steps to create the illusion of a marriage with

---

would have been asked the same questions under substantially similar circumstances, it is highly likely he would have made materially similar answers."). Moreover, *Vasquez De Reyes*, as a Third Circuit decision*,* is not binding on this Court. *See White v. State*, 243 A.3d 381, 402–03 (Del. 2020) (referencing Third Circuit decisions as "not binding" regarding questions that implicate both federal and state constitutional rights).

[49] *Vasquez De Reyes,* 149 F.3d at 193.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[her putative husband]; (2) an INS agent would have 'inevitably' become suspicious during the interview and would have requested an investigator to conduct a home visit; and (3) the interview and the home visit would have "inevitably" disclosed sufficient facts suggesting that the marriage was a sham such that the defendant and her [putative] husband would have confessed to the fraudulent nature of the marriage."[53]

These potentialities rest not only on the defendant's state of mind at a different time, but on the agents' states of mind to reach the same eventuality of the confessions. Here, by contrast, Garnett's arguments regarding a changed state of mind are much narrower, *i.e.*, that but for the illegal entry, Garnett would have been arraigned for his criminal impersonation charge and released, and thus different circumstances would have existed regarding both his arrest and, thereafter, his state of mind during questioning.

Garnett's arguments regarding his potential release, however, are not persuasive. In *Garnett I*, this Court found that Ms. Hill's body and the other physical evidence found in the home would inevitably have been discovered through lawful police investigative procedures shortly after their actual discovery. In addition, the State has proven by a preponderance of the evidence that Garnett would not have been released from custody prior to the discovery of the body because 1) the bloody sock and the information regarding Garnett's instructing M.S. to "hide" Ms. Hill's identification cards was discovered almost simultaneously with the illegal entry; 2) Garnett was being investigated, but not yet charged, for a domestic incident involving M.S. that had been substantiated on multiple levels; and 3) there was a

---

[53] *Id.* at 196.

high likelihood that CAC interviews of the children would have been undertaken given the totality of the circumstances.

Finally, the timing of Garnett's statement would have changed at most minimally, if at all, and not in a way that would have affected the circumstances surrounding the questioning or Garnett's state of mind.  Hence, the Court holds that this case is distinguishable from *Vasquez De Reyes*, as in that case "there was nothing about the entire process that was guaranteed or required."[54]  Here, Garnett would have been questioned in nearly the exact same circumstances as actually occurred and would have made materially the same statements to the officers.

Garnett advances an additional argument based on *Vasquez de Reyes* that is also unavailing, *i.e.*, that *any* change in the circumstances leading up to the confession, no matter how minor, would render the inevitable discovery doctrine inapplicable.  This Court, however, is unwilling to adopt a *per se* rule that any change in the conditions leading up to the confession, regardless of the nature of the change, renders employment of the inevitable discovery doctrine improper.  As noted *supra*, the Delaware Supreme Court has applied the inevitable discovery to testimonial statements by a defendant.[55]  Garnett's statements are likewise admissible under the inevitable discovery doctrine for the reasons explained *supra*.

**2. Even if Garnett's statement is not admissible under the inevitable discovery doctrine, the attenuation doctrine renders his statement admissible.**

As noted *supra*, the attenuation doctrine "permits courts to find that the poisonous taint of an unlawful search and seizure has dissipated when the causal connection between the unlawful police conduct and the acquisition of the

---

[54] *United States v. Denson*, 2006 WL 3144857, at *8 (W.D. Pa. Oct. 31, 2006) (referring to *Vasquez De Reyes*, 149 F.3d 192).
[55] *See Norman*, 976 A.2d at 859.

challenged evidence becomes sufficiently attenuated."[56]  "Thus, even if there is an illegal search or seizure, direct or derivative evidence, such as consent, may still be admissible if the taint is sufficiently 'purged.'"[57]  The attenuation doctrine was an outgrowth of the Supreme Court's decision in *Wong Sun v. United States*,[58] which determined that a statement made after an illegal arrest or search should be sufficiently an act of free will to purge the primary taint of the constitutional violation.[59]  Thus, the derivative evidence cannot be "come at by exploitation of that illegality[.]"[60]

The United States Supreme Court further explained the analysis a court should undertake by stating, in *Brown*, that Miranda warnings, by themselves, do "not alone sufficiently deter Fourth Amendment violation[s]" because "[t]hey cannot assure in every case that the Fourth Amendment violation has not been unduly exploited."[61]  Thus, the Court should consider, in addition to the presence of Miranda warnings, three factors when determining whether evidence that is impermissibly obtained may be sufficiently purged of the primary taint and admitted through the attenuation doctrine: "(1) the temporal proximity of the illegality and the acquisition of the evidence to which the instant objection is made; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official

---

[56] *Lopez-Vazquez*, 956 A.2d at 1293.

[57] *Id.* (citing *Brown,* 422 U.S. at 602; *Wong Sun,* 371 U.S. at 488 (noting that evidence is fruit of the poisonous tree depending on "'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by **exploitation of that illegality** or instead by means sufficiently distinguishable to be purged of the primary taint'" (emphasis supplied) (quoting (Maguire, Evidence of Guilt, 221 (1959))). *Accord State v. Severin*, 1982 WL 593131, at *1 (Del. Super. Mar. 23, 1982); *United States v. Chavez–Villarreal,* 3 F.3d 124, 127–28 (5th Cir.1993); *United States v. Butts,* 704 F.2d 701, 704 (3d Cir.1983)).

[58] 371 U.S. 471 (1963).

[59] *Id.* at 488 (citing Maguire, Evidence of Guilt, 221 (1959)).

[60] *See id.* at 486.

[61] 422 U.S. at 601, 603. *Brown's* procedural history involved what appeared to be a *per se* rule, adopted by some jurisdictions at the time, that a *Miranda* warning cured any *Wong Sun* issues. *Id.*

14

conduct."[62]  "No 'single factor' is dispositive in determining whether the evidence should be suppressed."[63]  Here, the primary taint is the illegal search that occurred at 6:26 a.m., and the potentially derivative evidence is Garnett's statement, including his confession, which began at 2:00 p.m.

As to the first factor, "temporal proximity",[64] over seven hours elapsed between the illegal entry and Garnett's custodial interrogation.  Unlike many cases, where there are only minutes between the two events,[65] here a substantial amount of time had passed.  More importantly, however, the temporal proximity is of minimal relevance given that Garnett was not present during the warrantless entry and presumably, since he was in custody during the intervening period, was not aware of it.  Typically temporal proximity is considered assuming the defendant's knowledge of the events, given that time alleviates the stress or influence that the illegality has on the defendant to make incriminating statements.  Here, where Garnett was not even present during the warrantless entry, the first factor is neutral.

Moving on to factor two, "the presence of intervening circumstances,"[66] the United States Supreme Court has explained that under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has

---

[62] *Lopez-Vazquez*, 956 A.2d at 1293 (citing *Brown*, 422 U.S. at 603–04).

[63] *Id.* (quoting *Brown,* 422 U.S. at 603).

[64] *See Utah v. Strieff,* 579 U.S. 232, 239 (2016) ("First, we look to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search.").

[65] *E.g.*, *id.* at 233 (finding that suppression is favored when "only minutes" takes place between the unconstitutional conduct and the discovery of evidence under the temporal proximity factor); *Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (finding that "10 or 15" minutes is not a "substantial time" between unlawful seizure and confession).

[66] *Brown* , 422 U.S. at 603.

been violated would not be served by suppression of the evidence obtained.'"[67] Examples of intervening circumstances include "release from custody, an appearance before a magistrate, or consultation with an attorney, 'such that we would be able to say that [a defendant's] consent to search was an "unconstrained, independent decision" that was completely unrelated to [the] initial unlawful' violation."[68]

Here, the intervening circumstance was Garnett's own voluntary, unelicited admission to Detectives Mullaney and Bumgarner, near the beginning of the taped statement, that he was aware of the presence of Ms. Hill's dead body at 32 Willis Road. Specifically, immediately after Detective Mullaney informed Garnett that officers had been to 32 Willis Road, Garnett told them his "story" about allegedly discovering Ms. Hill's body.[69] No evidence from the illegal search was used by the officers to confront Garnett. There was evidence used, *i.e.*, Ms. Hill's journal, that had been lawfully obtained from Garnett's person prior to the illegal search, and in that regard, attenuated from it.[70]

Therefore, in this case it was not the questioning officers who disclosed to Garnett the discovery of the body and other evidence obtained at the home, thereby exploiting that evidence to obtain a confession, but it was Garnett who first disclosed that he was aware of the evidence. That circumstance cured the illegally obtained

---

[67] *Strieff*, 579 U.S. at 238 (citation omitted).

[68] *United States v. Washington*, 387 F.3d 1060, 1073 (9th Cir. 2004) (quoting *United States v. George*, 883 F.2d 1407, 1416 (9th Cir. 1989)).

[69] The Court does not consider Detective Mullaney's mere statement that officers had been to the home an exploitation of the illegally obtained evidence. The two detectives mentioned nothing to Garnett about the body or other evidence discovered in the home and did not even reveal that officers had entered the home.

[70] *See Washington*, 387 F.3d at 1073 ("Intervening circumstances that militate in favor of attenuation must be sufficiently important to ensure that potentially tainted evidence was 'come at by way of' some process other than the exploitation of an illegal search." (citing *Wong Sun,* 371 U.S. at 487–88)).

evidence of any taint that could have resulted had the officers initially disclosed the illegally obtained evidence to Garnett.  Put another way, Garnett's confession is "remote" from the illegal police conduct due to Garnett's own disclosure that he was aware of the presence of the body. In addition, courts have held that "confrontations may constitute intervening circumstances under the *Brown* analysis."[71]  Here, the officers confronted Garnett with evidence, *e.g.*, Ms. Hill's journal, subsequent to his own disclosure of Ms. Hill's death, that was untainted from, or derived independently of, the warrantless entry.  The officers' use of the journal, specifically, its illumination of the relationship issues between Garnett and Ms. Hill, could be deemed a "precipitating cause" of his admissions.[72]

The third factor, "the purpose and flagrancy of the official misconduct,"[73] weighs heavily in the State's favor.  The officer who made the illegal entry did so for the primary reason of locating the children's mother, and possibly for a secondary reason of concern for her safety.[74]  At the time the officers entered the home, they were not aware of the fact that Garnett's sock had blood on it, or that he had told M.S. to "hide" Ms. Hill's Social Security card and driver's license.[75]  At the time, and voiced through the officers' testimony, there was no thought in their minds that the interior of the home would contain evidence that would incriminate Garnett.[76]

---

[71] *State v. Tobias*, 538 N.W.2d 843, 847 (Wis. Ct. App. 1995). *Accord People v. White*, 117 Ill. 2d 194, 224, 512 N.E.2d 677, 689 (Ill. 1987) (stating that "confrontation with untainted evidence, which induces in the defendant a voluntary desire to confess, may be a legitimate intervening circumstance"); *People v. Bradford*, 937 N.E.2d 528, 531 (N.Y. 2010) (finding that evidence derived independently of the unlawful event, with which officers confronted the defendant leading to a confession, can serve as a "significant attenuating factor").

[72] *Cf. Bradford*, 937 N.E.2d at 531.

[73] *Brown*, 422 U.S. at 604.

[74] *Garnett I*, 2021 WL 6109797, at *5.

[75] *Id.* at *3.

[76] *See id.* ("Meanwhile, Sergeant Lynch admitted in her testimony that had Patrolman Starke not opened the unsecured back door, she would have left and returned to the home at a later time to try to find the guardian of the children.").

There were three children, one less than a year old, in need of their guardian, and the officers misjudged the requirements for entering the home to alert the children's guardian of the situation. At most, this case is an example of a single officer's negligence and error of judgment regarding the emergency doctrine.[77]

In analyzing the three factors, the Court must look to the primary objective of *Wong Sun* and *Brown* to determine whether the illegally obtained evidence was exploited to arrive at the confession. As mentioned *supra*, there was no use of evidence obtained from the illegal entry during the officer's questioning of Garnett,[78] as neither the presence of Ms. Hill's body nor any other information derived from the search of the house was mentioned.[79] In addition, Miranda warnings were clearly provided to Garnett at the time of questioning, and he waived his Miranda rights.[80] Although Miranda warnings do not *per se* alleviate a taint, they are an "important factor."[81] Accordingly, the attenuation doctrine is applicable, and Garnett's statements are admissible under this doctrine as well.

---

[77] The officer, as mentioned in *Garnett I*, appeared to believe that an unsecured door warranted a lower standard to determine whether a warrantless entry is allowable given the totality of the circumstances. *Id.* *Cf. Strieff*, 579 U.S. at 233 ("The third factor, "the purpose and flagrancy of the official misconduct," . . . strongly favors the State. Officer Fackrell was at most negligent, but his errors in judgment hardly rise to a purposeful or flagrant violation of Strieff's Fourth Amendment rights. After the unlawful stop, his conduct was lawful, and there is no indication that the stop was part of any systemic or recurrent police misconduct").

[78] The officers did refer to journal entries of Ms. Hill. However, those were lawfully obtained from Garnett's person following his arrest.

[79] Garnett contended at oral argument that this Court should look at the statements only through the lens of the inevitable discovery doctrine, and not the attenuation doctrine as set forth in *Brown*. In advancing this contention, Garnett argued that *Brown* dealt with an unlawful arrest and not a search. However, in *Brown* the Supreme Court stated that *Wong Sun*, upon which *Brown* relied, "pronounced the principles to be applied where the issue is whether statements and other evidence obtained after an illegal arrest **or search** should be excluded." *Brown*, 422 U.S. at 597 (emphasis supplied).

[80] State's Ex. A, at 6:00–6:25.

[81] *See Brown* 422 U.S. at 603 ("The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest.").

## IV. CONCLUSION

For the foregoing reasons, Garnett's motion to suppress his taped statement is **DENIED**.

**IT IS SO ORDERED.**

_____
Noel Eason Primos, Judge

NEP/tls
oc: Prothonotary
cc: Counsel of Record