IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GREGORY WING, | § | |
| | § | No. 320, 2023 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID No.  2105000987 (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted:   June 26, 2024
Decided:      August 13, 2024

Before **TRAYNOR, LeGROW,** and **GRIFFITHS,** Justices.

Upon appeal from the Superior Court of the State of Delaware.  **AFFIRMED.**

Jan A.T. van Amerongen, Jr., Esquire, Wilmington, Delaware; Maureen Coggins, Esquire (*argued*), Norristown, Pennsylvania, *for Appellant Gregory Wing*.

Carolyn S. Hake, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice:

After a trial in the Superior Court that lasted 14 days and encompassed the testimony of over 50 witnesses and the admission of over 600 exhibits, a New Castle County jury found Gregory Wing guilty of gang participation and multiple violent crimes, including two counts of first-degree murder and four counts of attempted first-degree murder. Wing received two life sentences, plus a decades-long prison term. He now asks this Court to reverse his convictions and to order a new trial because of two evidentiary rulings during his trial. Both rulings—one allowing the jury to consider a witness's out-of-court statement to a police officer that included a damaging admission by Wing, the other relating to the scope of permissible cross-examination of another witness—were, under our law, committed to the sound discretion of the trial judge. For the reasons that follow, we have concluded that in neither instance did the trial judge abuse his discretion. Consequently, we affirm.

I

This case involves a shooting rampage on the streets of Wilmington over a five-day period, the likes of which, we suspect, would shock most Delawareans. And though a detailed recitation of each disquieting fact is not essential to our resolution of Wing's appellate claims, we lay out the following facts to establish the context in which Wing was indicted, tried, and convicted.

2

A

In the fall of 2020, the Wilmington Police Department ("WPD") launched an investigation into the NorthPak street gang and its suspected involvement in a series of violent crimes in the City of Wilmington. The WPD determined that NorthPak, which considers itself the "Taliban" of the north side of Wilmington,[1] is a "hybrid criminal street gang," with no "clear code of conduct"[2] that is motivated, in one former member's words, not by drugs or money, but by "revenge" and "rep chasing."[3] The investigation unearthed at least 18 key players in NorthPak, including Wing and his co-defendant Elijah Coffield.[4] Wing and Coffield were identified as "leaders" and "shooters" for NorthPak.[5]

Investigators learned that NorthPak was engaged in a violent feud with a rival Wilmington street gang known as the M-Block Grimy Savages ("MGS"). Both gangs used Instagram, YouTube, and other social media platforms to communicate, for self-promotion, and to "intimidate [and] inflict fear amongst . . . opposing gangs[.]"[6] Perceived social media slights ignited violence and turned individuals

---

[1] App. to Answering Br. at B53–54, B57. NorthPak selected its moniker to suggest that "the north side of Wilmington is like Pakistan" and used that "as an intimidation factor." *Id.*

[2] *Id.* at B47–51.

[3] *Id.* at B743. NorthPak sought revenge for the deaths of Rajion Dinkins and Christian Coffield. *Id.* at B133.

[4] Answering Br. at 5–6. NorthPak members refer to one another by nicknames. Wing is also known as Swerve, John Wick, and G Herb. Coffield is known as Beam.

[5] App. to Answering Br. at B723–24.

[6] *Id.* at B38.

into targets. NorthPak sought to kill those targets, or their friends and family members, each killing considered a "score" adding to their side's total body count in the ongoing feud.[7]

By the summer of 2020, NorthPak was "on offense" against MGS and actively seeking MGS-affiliated targets to kill so they could "feel like [they] were winning."[8] To that end, NorthPak gang members often stole cars to "spin the block," a slang term meaning to look for targets.[9] If the opportunity arose, NorthPak would run a "drill," a slang term for a shooting, including a drive-by shooting.[10]

On the evening of September 8, 2020, three such attacks took place in close succession. First, around 7:00 p.m., 17-year-old Ol-lier Henry and 19-year-old Taquan Davis, both associated with MGS, were walking home from a memorial service along North Pine Street; they were accompanied by Antionajsa Williams and another woman. A car with tinted windows pulled up beside them, and two masked men opened fire on the group, which quickly dispersed. Henry was struck several times and Williams was grazed, but Davis and the other woman escaped unharmed. WPD officers responded to the scene and found Henry unconscious with gunshot

---

[7] *Id.* at B75 ("s[o] shooting someone affiliated let's say with MGS would still be a score. Because unfortunately if you take a picture with MGS members and post it to Instagram, members like NorthPak will notice that you are now hanging out with the opposition. You're at least associated with the opposition, so then that puts a target on your back in the streets in real life."). *See also* App. to Opening Br. at A189.

[8] App. to Opening Br. at A204. App. to Answering Br. at B748.

[9] App. to Opening Br. at A93–94.

[10] *Id.*

4

wounds to his head and torso; he was later pronounced dead at Christiana Hospital. The aftermath of the Pine Street shooting was captured on surveillance cameras, and officers found three .22 caliber shell casings and one 9mm projectile at the scene.

Around 7:10 p.m., 15-year old Javar Curtis, who had "beefed" with NorthPak the week before,[11] was walking home from his grandmother's house. While walking through Southbridge in Wilmington, Curtis observed individuals in a black Nissan Altima "looking at him real hard[.]"[12] Fearing that the car's occupants were in NorthPak, Curtis crossed the street. He briefly evaded the Altima, but when he saw the car a second time, Curtis presumed that it was "looking for [him]," so he ran.[13] Curtis again dodged the car momentarily, but when it came upon him a third time, two masked passengers fired six shots at him. Curtis ducked and narrowly avoided being struck in the face. The shooting was captured on surveillance video,[14] and police found four .22 caliber shell casings at the scene.

Less than an hour later, around 7:56 p.m., Bryshawn Lecompte and Jiveer Green were driving in the area of 7th and Jackson Streets. Lecompte was considered a NorthPak "opp"[15] because he was "best friends" with someone who had disrespected NorthPak in rap videos, and Green was considered an "opp" because of

---

[11] *Id.* at A183–84; App. to Answering Br. at B358.
[12] App. to Answering Br. at B344–46.
[13] *Id.* at B347.
[14] *Id.* at B351–52, B394–411, B754.
[15] Opposing gangs or individuals associated with them are also referred to as "opps." *See id.* at B51.

5

his association with Lecompte.[16]  A dark-colored, four-door car pulled up next to Lecompte and Green, and two men fired several shots into their car.  Green dodged the bullets, but Lecompte was struck, and he drove quickly to St. Francis Hospital where he was treated for gunshot wounds to his left leg and arm.  WPD investigators recovered three 9mm shell casings and seven .22 caliber shell casings from the scene.

Davis, the individual who WPD investigators surmised was the primary target of the first shooting, survived the day—but not the week.  Following the September 8th shootings, Davis made several Instagram posts lamenting Henry's death and taunting NorthPak.  On September 12, 2020, around 7:00 p.m., Davis was at a store on the corner of Elm and Harrison streets.  As he was leaving, someone called out his name, prompting him to step out of his car to look.  When he did, several shots were fired, striking Davis in his mouth, chest, and left arm, and he died from the injuries.  No ballistics evidence was found at the scene, but three 9mm shell casings were recovered months later in a stolen Hyundai Sante Fe found abandoned near co-defendant Coffield's residence.

On September 16, 2020, Delaware State Police ("DSP") officers observed a "dark colored Nissan Altima" pull into a Wawa market on Philadelphia Pike in Wilmington.  The car caught the officers' attention because it "came in at a high rate

---

[16] App. to Opening Br. at A113, A303–04.

of speed and erratic[ally]."[17]  DSP conducted a registration check and learned that the vehicle had been reported stolen.  Officers observed Wing exit the Altima and enter the Wawa.  When he returned, officers converged on the vehicle.  Wing fled but was apprehended not far away with a black firearm and eleven 9mm live rounds of ammunition in his possession.  Officers also found three 9mm shell casings in the Altima.  Following his arrest, Wing pleaded guilty to carrying a concealed deadly weapon—a 9mm Beretta—and receiving stolen property—the Nissan Altima.[18]

Wing was later tied to the September 8th and 12th shootings through ballistics evidence, cell tower data that indicated his phone number as active near all three of the September 8th shootings, social media posts and messages, and witness testimony.  The ballistics evidence linked the 9mm Beretta officers seized during Wing's arrest to the 9mm shell casings recovered from the stolen Nissan Altima, the scene of the Lecompte/Green shooting, and the stolen Hyundai Sante Fe tied to Davis's shooting recovered near Coffield's residence..  Wing's 9mm Beretta was also matched by ballistics with projectiles recovered from Henry's and Lecompte's bodies.

Wing's social media accounts also incriminated him.  Hours before the September 8th shooting spree, Coffield exchanged messages with Wing and Wing's

---

[17] App. to Answering Br. at B178.
[18] App. to Opening Br. at A130–31, A175.

brother over Instagram through which Wing learned that "opps" were out "on Pine."[19] Wing told Coffield he was on his way and also sent Coffield a "selfie style photo[] with a magazine for a weapon."[20] About an hour before Henry's murder, Coffield told Wing that he was "out back," to which Wing responded "[h]ere I come brody."[21]

Not long after Henry's murder, another NorthPak gang member, Caleb Lancaster, told Wing that he was being credited with Henry's death, to which Wing replied, "my wreck,"[22] a phrase that Investigator Masi, a criminal-intelligence analyst who testified for the State at trial, explained meant that Wing was in fact taking credit for the shooting. Ten minutes later, Lancaster sent Wing a photograph of WPD officers attempting to revive Henry while Davis sat nearby. Lancaster sent Wing another photo after Henry was pronounced dead. Later that night, Wing posted a photo of himself on Instagram holding a black Beretta 9mm. On September 10th, Wing posted on Instagram stating "check da score" and "I'm dropping sh*t lol."[23]

When Davis posted about Henry's death on Instagram and included his location with a message saying "[c]ome get me,"[24] Wing viewed the video numerous

---

[19] App. to Answering Br. at B304–09.
[20] *Id.* at B317.
[21] *Id.* at B318–19.
[22] *Id.* at B333–34.
[23] *Id.* at B500–01, B784.
[24] *Id.* at B595.

8

times and messaged Lancaster: "I should go smoke . . ." Davis.[25] Wing also posted his own video antagonizing and mocking Davis.

Wing also appeared to set up purported alibis following both the September 8th and 12th shootings. On September 8th, Wing messaged another NorthPak gang member and asked: "gotta pic at da airport?"[26] Malik Benson sent Wing a photo from the inside of an airplane looking out on clouds and told Wing to post it in the morning. On September 12th, Wing asked Benson for a photo "of you driving," and Benson responded with a video of him driving on the highway.[27] WPD Detective Justin Kane testified that the message about the driving video "jumped out" to him as Wing looking for "a possible alibi . . . [l]ike do you have an airport or airplane photo."[28]

Among the over 50 witnesses who testified during Wing's trial was NorthPak gang member Stanley Jones. Jones testified that he, Wing, and Coffield committed the September 8th shootings, and also that he was with Wing when Wing shot Davis on the 12th. Jones said that he stole the Nissan Altima on September 8th, that Wing was the driver for all three of the shootings on that date, and that he and Coffield were in the front passenger and back seats, respectively. Jones described the Pine

---

[25] *Id.* at B607.
[26] *Id.* at B484–87.
[27] *Id.* at B624–25.
[28] *Id.*

Street shooting, noting that Wing stopped next to Henry and Davis, reached over Jones, and fired the Beretta. Wing drove away as Jones threw shell casings from the car.

Jones testified that as they drove away from the scene of the Pine Street shooting, Wing "recognize[d] someone by the name of Var from East,"—a nickname of Javar Curtis[29]—and that Wing did not let Curtis "fully leave [our] sight."[30] Once Wing had the Altima in "a good position where . . . it was clear to shoot, [Wing and Jones] shot" at Curtis.[31]

Jones said that, as they continued on, they "[j]ust happened to see"[32] LeCompte and Green sitting in their car at a red light. Jones testified that when they first saw LeCompte and Green, they were in a single lane of traffic and not in a position to shoot, so Wing followed the car to a second red light. When they got close enough, Jones and Coffield fired several shots into the vehicle and at Lecompte and Green. Jones admitted that his testimony was inconsistent with his earlier statement to detectives that Wing and Jones were the shooters in that incident.

Jones also testified that he had stolen the dark-colored Hyundai Santa Fe tied to Davis's murder.[33] He said that Wing was driving the Sante Fe when they saw

---

[29] *Id.* at B341, B754.
[30] *Id.* at B754.
[31] *Id.*
[32] *Id.* at B755.
[33] *Id.* at B757.

Davis, so Wing circled the block.[34]  Jones indicated that, because "[he] was rep

chasing," he asked Wing if he could shoot Davis.[35]  But Jones explained that,

because the Beretta belonged to Wing, it was "ultimately [Wing's] decision" and

Wing opted to reach over Jones to shoot Davis.[36]  Wing then drove to a Wawa where

the pair broadcast themselves over Instagram live "laughing a little bit."[37]  They then

abandoned the Hyundai near Coffield's house.

B

In May 2021, Wing, along with 14 co-defendants, was indicted by a New

Castle County grand jury for illegal gang participation and 24 underlying offenses.

Wing was reindicted in November 2021 and charged with illegal gang participation

and 15 underlying offenses including: murder in the first-degree (two counts),

attempted murder in the first-degree (four counts), possession of a firearm during

the commission of a felony ("PFDCF") (seven counts), conspiracy in the first degree

(three counts) and attempted assault in a detention facility.  Wing and Coffield were

tried together by a jury.

The jury found Wing guilty of all but three of the operative indictment's 16

counts.  Most notably, among the crimes for which the jury returned guilty verdicts

---

[34] *Id.* at B757–58, B760.
[35] *Id.* at B757.
[36] *Id.* at B758.
[37] *Id.*

were illegal gang participation and all the charged murders, attempted murders, and conspiracies. Wing received two life sentences for the first-degree murder convictions and 113 years of Level V incarceration, suspended after 85 years, for the remaining convictions. Wing then appealed.

C

Although the trial was lengthy—as mentioned, it lasted 14 days, and encompassed the testimony of over 50 witnesses and the admission of over 600 exhibits—it is the testimony of two witnesses that yielded the rulings that Wing claims were erroneous and cause for reversal of his convictions.

As will be more fully developed below, Wing asserts that the Superior Court erred by admitting into evidence an out-of-court statement made by Kenneth Griffin to Detective Kane of the WPD. The court allowed evidence of that statement under 11 *Del. C.* § 3507, which authorizes the use of prior out-of-court statements as affirmative evidence subject to certain conditions and foundational requirements. Wing contends that those conditions and requirements were not met here and that admission of evidence of the statement was reversible error.

Wing also contends that the Superior Court erred by unduly limiting his cross-examination of Tyrie Burton, a witness who offered testimony that incriminated his co-defendant Coffield. Coffield's counsel posed questions to Burton during cross-examination related to whether Burton had committed

uncharged murders. The State objected, arguing that counsel's questions were "getting into [Burton's] Fifth Amendment right and uncharged misconduct."[38] Wing argues that the court erred in sustaining the objection because "[c]ross examination on [Burton's] knowledge and involvement in his own murders would have shown his bias."[39]

## II

Wing concedes that his claims of error are subject to review for abuse of discretion.[40] "An abuse of discretion occurs when a court has exceeded the bounds of reason in light of the circumstances, or so ignored recognized rules of law or practice so as to produce injustice."[41]

The State contends that Wing did not properly preserve certain claims of error he has now raised on appeal. In the absence of plain error, we will not consider claims that were not fairly presented to and considered by the trial court.[42] Plain error is error so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the proceedings.[43]

---

[38] App. to Opening Br. at A224.
[39] Opening Br. at 39.
[40] *See Turner v. State*, 5 A.3d 612, 615 (Del. 2010) (reviewing the Superior Court's admission of an out-of-court statement under § 3507 for abuse of discretion); *Thompson v. State*, 399 A.2d 194, 198–99 (Del. 1979) ("A decision whether to admit testimony under particular circumstances is within the sound discretion of the Trial Judge and will not be reversed absent a clear showing of an abuse.").
[41] *McNair v. State*, 990 A.2d 398, 401 (Del. 2010).
[42] *Russell v. State*, 5 A.3d 622, 627 (Del. 2010).
[43] *Roy v. State*, 62 A.3d 1183, 1191 (Del. 2012).

## III

Our analysis starts with consideration of Wing's contention that the Superior Court erred by allowing the State to use Griffin's out-of-court statement under 11 *Del. C.* § 3507; we conclude with a review of Wing's claim that the court improperly restricted his cross-examination of Burton.

## A

On the eleventh day of trial, the State called Kenneth Griffin as a witness.[44] While incarcerated in Pennsylvania on gun charges, Griffin had, on October 30, 2020, requested to speak with a WPD detective regarding NorthPak. Detective Kane met with Griffin and recorded his statement. Griffin told Detective Kane that Wing and Coffield were "big players" in NorthPak[45] and that NorthPak kills people "because that's what they do."[46] Griffin made incriminating remarks regarding Coffield, including that Coffield got his guns from someone named "St[u],"[47] and that Coffield and Wing were trying to shoot Davis.[48] Griffin told Detective Kane that Wing told Griffin that he killed Ol-lier Henry, also known as Baby Butter,[49] and

---

[44] App. to Opening Br. at A254–301.
[45] Opening Br. at 18–19. App. to Answering Br. at B795; Court Exhibit 45.
[46] App. to Answering Br. at B810; Court Exhibit 46.
[47] App. to Answering Br. at B806; Court Exhibit 47.
[48] App. to Answering Br. at B819; Court Exhibit 50.
[49] App. to Answering Br. at B817–19; Court Exhibit 50. *See also* Answering Br. at 25 n.56.

also that Wing told Griffin he killed Davis with the gun Wing had in his possession when arrested.[50]

During direct examination by the prosecution, Griffin was uncooperative. He acknowledged that he had spoken with Detective Kane, but he testified that he had "told Mr. Kane I didn't want to speak to him."[51] When the prosecutor asked Griffin, "[w]hen you spoke to [Detective Kane], did you tell the truth?"[52] Griffin responded, "I spoke on Butter."[53] When asked again if he was truthful during the conversation, Griffin repeated, "Yeah. I spoke on Butter. Yeah."[54]

The State then requested that Griffin step down from the witness stand so that Detective Kane could answer "foundational questions" as a prelude to playing audio clips of Griffin and Kane's October 30, 2020 conversation for the jury under 11 *Del. C.* § 3507.[55] Griffin left the witness stand but remained in the courtroom. Detective Kane testified that an ATF Agent had notified him that an individual facing charges in Pennsylvania had requested to speak with a WPD officer regarding NorthPak.[56] Detective Kane clarified that he was not familiar with Griffin before they spoke, and when they met the detective read Griffin his *Miranda* rights, and Griffin confirmed

---

[50] App. to Answering Br. at B821; Court Exhibit 51.
[51] App. to Opening Br. at A257.
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.* at A258.
[56] *Id.* at A261.

15

that he wished to speak. Detective Kane said that Griffin then provided information regarding NorthPak's involvement in "a multitude of crimes that happened in Wilmington,"[57] including the deaths of Henry and Davis.

On cross-examination—at this point, limited to the admissibility of Griffin's recorded statement—defense counsel questioned Detective Kane on where he had met with Griffin, and whether Griffin had requested lower bail in exchange for the information he provided. Detective Kane reported that the meeting was in a courthouse in Media, Pennsylvania. Regarding whether Griffin requested a bail modification, the detective initially testified he could not then recall but later confirmed that such a request was made.

Coffield's counsel then objected to admission of the audio clips on the grounds that Griffin was "in cuffs and in custody" when he spoke to Kane and therefore his statement was not voluntary.[58] The Superior Court disagreed. The court reasoned that Griffin reached out to Detective Kane and that he was informed of—and waived—his rights under *Miranda v. Arizona*.[59] Because the statement was voluntary, and because the State had "touched on the issue of truthfulness . . . and on the topics of the conversation," the court concluded that the foundational

---

[57] *Id.* at A263.
[58] *Id.* at A267.
[59] *Miranda v. Arizona*, 384 U.S. 436 (1966).

requirements of § 3507 had been met.[60]  The State then introduced ten audio clips, some of which implicated Wing in the charged offenses.  The jury listened as Griffin revealed, among other things, that Wing and Coffield were "big players" in NorthPak and that Wing had admitted that he had shot Davis and Henry.  After the clips were played, Detective Kane was dismissed and Griffin returned to the stand.[61]

After Griffin's direct examination resumed, the prosecutor asked Griffin whether his recorded statement to Detective Kane that Wing had killed Henry was true.[62]  Griffin responded that "a lot of what sh*t was just in the air" and suggested that officers had corrected him on Henry's name and "then they record[ed]."[63]  Griffin also testified that Wing did not tell him that he had killed Davis.

B

Wing contends that the foundation for the use of Griffin's October 30, 2020 statement to WPD Detective Kane was deficient in two respects.  First, he claims that the prosecution failed to establish that the statement was voluntary.  Second, Wing argues that the statement was inadmissible under § 3507 because it was "not truthful."  On this second point, he concludes that Griffin's acknowledgement that "he told the truth specifically about 'Butter' means everything else that Griffin told

---

[60] App. to Opening Br. at A267–68.
[61] Id. at A280.
[62] Id. at A287–88.
[63] Id. at A290.

17

police was a lie."[64]  These arguments bespeak a fundamental misunderstanding of our cases that address the proper application of § 3507.  We therefore reject them both.

(i)

Our analysis of Wing's claim that Griffin's out-of-court statement to Detective Kane were improperly admitted under 11 *Del. C.* § 3507 begins with the statute's text, which provides in pertinent part:

> (a)  In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.
>
> (b)  The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not.  The rule shall likewise apply with or without a showing of surprise by the introducing party.

Beginning with *Keys v. State*[65] nearly 50 years ago through just last year in *McCrary v. State*,[66] this Court has spelled out the elements of the evidentiary foundation that must be laid to support the use of an out-of-court statement under § 3507.  We would do well to summarize where we stand on this issue at present.

Before allowing the use of an out-of-court statement, the trial judge "must be satisfied that the offering party has shown by a preponderance of the evidence that

---

[64] Opening Br. at 33.
[65] 337 A.2d 18 (Del. 1975).
[66] 290 A.3d 442 (Del. 2023).

the statement was voluntarily made, and must render an explicit determination on the issue before admitting it for the jury's consideration."[67]  By requiring the witness whose out-of-court statement is proffered to be "subject to cross-examination," the statute implicitly "requires the direct examination of the declarant by the party offering the statement . . . ."[68]  The direct examination must encompass—or at least "touch on"[69]—"both the events perceived [or heard] and the out-of-court statement itself."[70]  Finally, the witness must testify about the truth or falsity of the statement. The witness need not affirm the truthfulness of the statement[71] but must say "whether or not [it is] true."[72]

(ii)

Wing, as mentioned, takes aim at the voluntariness of Griffin's statement.  His shot, however, lands wide of the mark.  Whether a statement is voluntary "is a question of fact to be determined from the effect that the totality of the circumstances

---

[67] *Woodlin v. State*, 3 A.3d 1084, 1087 (Del. 2010) (quoting *Hatcher v. State*, 337 A.2d 30, 32 (Del. 1975)).

[68] *Keys*, 337 A.2d at 20 n.1.

[69] *McCrary*, 290 A.3d at 459–60.

[70] *Id.* at 456.

[71] *Moore v. State*, 655 A.2d 308, 1995 WL 67104, at *2 (Del. Feb. 17, 1995) (TABLE) ("Under § 3507, there is no requirement that the witness either affirm the truthfulness of the out-of-court statement, or offer consistent trial testimony."); *see also Blake v. State*, 3 A.3d 1077, 1082 (Del. 2010) (discussing "[t]he foundation requirement that the witness indicate whether or not the prior statement is true. . .").

[72] *Ray v. State*, 587 A.2d 439, 443 (Del. 1991).

had upon the will of the defendant."[73]  Then-Chief Justice Steele described a trial judge's remit when assessing the voluntariness of a statement:

> The question the trial judge must resolve is whether the conduct of the police overbore the will of the declarant when he made his statement.  This determination is for the trial judge to make on a case by case basis, and the central question a trial judge faces is whether the behavior of the interrogators was such as to overbear the will of the interrogated to resist and bring about a statement not the product of a rational intellect and a free will without regard to the truthfulness or reliability of the statements.[74]

And we generally defer to a trial court's determination as to voluntariness.[75]  The trial court's ruling on voluntariness must stand unless its findings are clearly erroneous.[76]

Wing's argument that Griffin's statement was not voluntary is two-fold.  First, he points to Griffin's testimony that he did not want to speak with Detective Kane and that he refused to talk with WPD detectives on three occasions.  Second, he claims that Griffin was tricked into speaking with Detective Kane under the guise that his cooperation would lead to a reduction in his substantial bail.  But Wing ignores the fact that Griffin initiated the meeting with Detective Kane, whose testimony on this point was crystal-clear:

---

[73] *Baynard v. State*, 518 A.2d 682, 690 (Del. 1986).
[74] *Taylor v. State*, 23 A.3d 851, 860 (Del. 2011) (Steele, C.J., dissenting).
[75] *Id.* at 854.
[76] *Harris v. State*, 622 A.2d 1095, 1993 WL 61667, at *2 (Del. Feb. 3, 1993) (TABLE).

Q. Detective Kane, did you have occasion to speak to Mr. Kenneth Griffin on October 30, 2020?

A. Yes, I did.

Q. Could you explain to the jury the circumstances of how you came to speak to Mr. Griffin that day?

A. Yes. So at that time there was an ATF agent who worked in conjunction with the Wilmington Police Department. . . . She worked in cold case investigations with our department.

At that time she notified me that there was an individual who was facing some charges in Pennsylvania who has requested to speak with a Wilmington detective about a group called NorthPak. And so she made contact with Delaware County and we went up there to the courthouse in Media, PA, and we went there at the behest of this individual who was facing charges who was Kenneth Griffin and we went up there because he asked to speak with us.

Q. So Ke[nneth] Griffin asked to speak to a Wilmington detective on October 30, 2020?

A. Yes.[77]

That Griffin initiated the contact with the WPD on October 30, 2020 weighs heavily in favor of the trial court's finding that his statement that day was voluntary. And Griffin does not explain how his refusal to speak with WPD officers on three subsequent occasions undermines the conclusion that he voluntarily spoke with them

---

[77] App. to Opening Br. at A260–61.

when he first sought them out; if anything, it confirms that his will to resist interrogation could not easily be overborn.

In like manner, Wing's claim that Griffin was deceived by Detective Kane with a promise of bail reduction runs counter to the record. In the first place, Wing does not explain how Detective Kane—a WPD detective—could effect a bail reduction in Griffin's Pennsylvania case. But more to the point, the record suggests that securing a bail reduction was Griffin's objective in reaching out to the WPD through the ATF agent and not bait used by the WPD to lure Griffin into cooperating. Again, Detective Kane's testimony on the point was clear:

> Q.   . . . Detective Kane, Mr. Griffin spoke to you because he wanted something. Is that fair?
>
> A.   Yes.
>
> Q.   What was that?
>
> A.   Bail lowered.
>
> Q.   Did you have any power to do that?
>
> A.   No. Not at all.[78]

The trial court astutely recognized that Griffin was trying "to sell"[79] his voluntary statement to secure the benefit of a bail reduction, a fact that the court found militated in favor of a finding of voluntariness. We see it the same way.

---

[78] *Id*. at A270.
[79] *Id*. at A268.

22

Wing also takes the trial court to task for considering in its voluntariness analysis that Griffin was read and waived his *Miranda* rights. Without citing authority, Wing announces that "*Miranda* rights should not be considered a factor in determining the voluntariness of a witness'[s] statement[.]"[80] But this Court has recognized that the *Miranda* safeguards "mitigate the inherently coercive pressure of a custodial interrogation."[81] We have, moreover, expressly identified *Miranda* warnings as being among the totality of the circumstances to be considered when assessing the voluntariness of a defendant's statement;[82] we see no reason why they should be less relevant when considering the voluntariness of a witness's statement.

Finally, we have listened to the recordings of the excerpts of Griffin's statement. Nothing in the recordings suggests that Detective Kane was aggressive in his questioning or that Griffin was under stress or an unwilling participant in what sounds like a relatively relaxed conversation. In sum, the trial court's determination that Griffin's out-of-court statement to Detective Kane on October 30, 2020 was voluntary is supported by sufficient evidence. It was well within the bounds of reason in light of the circumstances and did not ignore any rules of law or practice so as to produce injustice.

---

[80] Opening Br. at 32 (emphasis added).
[81] *Taylor*, 23 A.3d at 855.
[82] *Baynard*, 518 A.2d at 691.

(iii)

Wing argues next that "the Court erred when it allowed Mr. Griffin's statement to be introduced under [§] 3507 because the statements were not truthful."[83] In its answering brief, the State points out that Griffin makes this argument for the first time on appeal. Wing, in his reply, does not contest this assertion but stands on its objection at trial that the statement was inadmissible because it was not voluntary. We agree with the State that voluntariness and testimony regarding truthfulness are two separate bases for objecting to the admission of a § 3507 statement. Thus, subjecting this argument to plain-error review would be fully justified. Nevertheless, because Wing's argument based on the truth or falsity of Griffin's statement is based on a patently erroneous application of our case law, the standard by which we view it does not matter. Simply put, Wing's argument is without merit. As previously mentioned, "there is no requirement that the witness either affirm the truthfulness . . . or offer consistent trial testimony."[84] The witness need only indicate whether or not the prior statement is true.[85] And here, Wing concedes that Griffin did just that.

Recall that, on direct examination, the prosecutor asked Griffin if he told the truth to Detective Kane. Griffin, though evasive, confirmed that he had, at least

---

[83] Opening Br. at 32–33.
[84] *Moore*, 1995 WL 67104, at *2.
[85] *Blake*, A.3d at 1082.

24

when he "spoke on Butter."[86]  In his opening brief on appeal, Wing "avers that his acknowledgement that he told the truth specifically about 'Butter' means everything else that Griffin told the police was a lie."[87]  The prosecutor's direct questions, Griffin's answers, and his interpretation of them as quoted above satisfy us that Griffin provided an adequate indication of whether or not his out-of-court statement was true.

For these reasons, we conclude that the Superior Court did not abuse its discretion by admitting into evidence Griffin's October 30, 2020 statement to Detective Kane.  We turn next to Wing's contention that the trial court abused its discretion by restricting his cross-examination of a witness called by the State.

C

On the ninth day of trial, the State called former MGS gang member Tyrie Burton to testify regarding inculpatory statements that Coffield—Wing's codefendant—had made while the two were incarcerated in adjacent prison cells. Burton testified that he pleaded guilty to conspiracy to commit murder in an unrelated case and had signed a cooperation agreement with the State to testify at Wing and Coffield's trial.

---

[86] *See supra* p. 15.
[87] Opening Br. at 33.

Burton explained that he knew both Wing and Coffield as well as two of the victims, Davis and Henry.[88] Burton described Henry and Davis as "long time" friends of his[89] but stated that he was not "cool with" Coffield.[90] Burton's testimony focused on the feud between NorthPak and MGS, noting that NorthPak was "on the offense" towards the end of 2020.[91] Burton described how he had reached out to the WPD after speaking to Coffield through a vent between their prison cells, and that he had told detectives the truth regarding what Coffield had told him about the day that Henry was killed. He also testified that Coffield bragged that he had the best stolen vehicle, a black Nissan with tinted windows, which he used for "drills."[92]

As it did with Griffin, the State had Burton step down from the stand to call Detective Jones, the WPD detective to whom Burton had spoken, to lay the foundation for the use of Burton's recorded statement to Jones under § 3507. While Detective Jones was on the stand, the State played, without objection, three audio clips from Burton's recorded statement. The clips were redacted to avoid any mention of Wing.[93] In the audio clips, Burton told detectives that Coffield confessed his involvement in the September 8th shootings.

---

[88] App. to Opening Br. at A184–206.
[89] *Id.* at A186–87.
[90] *Id.* at A206.
[91] *Id.*
[92] *Id.* at A209–10.
[93] *Id.* at A212–16; App. to Answering Br. at B679–81.

During cross-examination, Coffield's counsel questioned Burton about his testimony that NorthPak and MGS kept "score" in their feud—specifically, about how many NorthPak members Burton had killed while he was a member of MGS. Burton told counsel that he would "rather not answer no question like that[,]"[94] and "I'm not saying if I did or I didn't" and also that he did not know the current score.[95]

Undeterred by Burton's reluctance to address his own misdeeds, Coffield's counsel pushed on and asked Burton "[h]ow many people in NorthPak did MGS kill"[96] and "[h]ow many people were in your gang with MGS?"[97] Burton's responses were non-committal. Coffield's counsel circled back, asking Burton, "[h]ave you killed any members of these other gangs?"[98] This question elicited an objection from the State:

> [T]he S[t]ate would object to this line of questioning. [Counsel] can get into the charges that Mr. Burton was charged with as it pertains to MGS investigation and what was dropped and the deal he got, but asking him about murders he has committed is getting into his Fifth Amendment Right and uncharged misconduct.[99]

During the ensuing sidebar conference, Wing's counsel limited his response to the State's objection to the question's impeachment value:

---

[94] App. to Opening Br. at A220.
[95] *Id.* at A221.
[96] *Id.*
[97] *Id.* at A222.
[98] *Id.* at A224.
[99] *Id.*

In his statement he's asked or he says he was not involved in any murders. So that's why I believe this line of questioning is relevant because he lies in his statement to the police.[100]

After Coffield's counsel confirmed that his questions also were designed to impeach Burton's credibility, the trial judge directed Coffield's counsel's attention to the heart of the matter in the following exchange:

> THE COURT: I think the fact is he's [not] going to answer if he killed anybody.[101]
>
> COFFIELD'S COUNSEL: Well, he can do that.
>
> THE COURT: And I think he's told you that.
>
> COFFIELD'S COUNSEL: I'm stuck with it.
>
> THE COURT: Yes.[102]

Coffield's counsel then moved on with his cross-examination.

Wing now asserts that the trial court erred reversibly when it sustained the State's objection to the question put to Burton by Coffield's counsel. Though

---

[100] *Id*. at A225.

[101] The court reporter transcribed this comment as follows: "I think the fact is he's going to answer if he killed anybody." *Id.* at A226–27. In its answering brief, the State interpreted the exchange as evidencing the court's belief "that Burton was not going to answer . . . and [that] Coffield acknowledged that Burton could do that." Answering Br. at 44. Consistently with that interpretation, the State quoted the second statement by the court as "And I think he's told you that [he is not going to answer]." *Id.* at 45. Although the State does not mention it, this interpretation is necessarily based on a judgment that the court reporter's transcription was in error. We think that the judgment is a sound one in that the exchange does not make sense without the interpolation of "not" into the court's first statement. We note, too, that, in his reply brief, Wing did not take issue with the State's rendition of the exchange.

[102] App. to Opening Br. at A226–27.

28

imprecise in its formulation, Wing's argument appears to be that whether or not Burton had killed members of NorthPak was relevant for impeachment purposes and to show that Burton harbored bias against his NorthPak rivals, including Coffield and Wing. According to Wing, Burton's testimony, which touched upon his knowledge of slang used by gangs to describe "shootings, murders, stolen cars[,] and other criminal activity[,]"[103] was crucial to the State's case. The prohibited question, Wing says, was designed to "follow[] up in the area of [Burton's] personal experience with and knowledge of these phrases."[104] Wing claims that, "by precluding the defense from questioning the witness about whether he had killed anyone, they were not able to fully and effectively cross examine him about the facts of his open case for conspiracy to commit murder[,]"[105] a case about which "he lied . . . to the police."[106] Wing also points to Burton's testimony concerning "several of the murders [Wing and Coffield] were charged with[]"[107] and "crimes that Burton claimed were admitted to by [Coffield], [which] involved predicate acts under [Wing's] gang participation charge."[108]

The State responds that Wing did not raise his argument below and that any error as to it was not plain. The State downplays the significance of Burton's

---

[103] Opening Br. at 37.
[104] *Id*. at 39.
[105] *Id*. at 39–40.
[106] *Id*. at 40.
[107] *Id*. at 40–41.
[108] *Id*. at 41.

testimony as to Wing, noting that Burton's out-of-court statement was redacted to eliminate any "reference or implication of Wing by Coffield to avoid any *Bruton* issues."[109] The State also observed that there was overwhelming evidence of Wing's guilt independent of Burton's testimony, including Jones's eyewitness testimony and Wing's inculpatory statement that Henry was his "wreck."

As mentioned, we review a trial court's evidentiary rulings for abuse of discretion and claims of error not preserved below only for plain error. Here, because we conclude that the trial court did not abuse its discretion, we need not decide whether Wing preserved this issue during the trial.

As for Burton's bias, the jury was aware that he was a former member of a rival gang who hoped to derive future benefits from his testimony. His bias against Wing and Coffield was obvious. As for his credibility, Wing availed himself of the opportunity on cross-examination to ask about Burton's lie to the police,[110] the conspiracy charge to which he had pleaded guilty, and the animosity between NorthPak and MGS. Wing even was permitted to elicit Burton's guilt-laden answer

---

[109] Answering Br. at 46. *See Bruton v. United States*, 391 U.S. 123 (1968) (holding that the introduction of a codefendant's confession at a joint trial, which confession added substantial weight to the government's case, when codefendant did not testify, violated Bruton's Sixth Amendment right of confrontation that could not be cured by a jury instruction to disregard the confession as to Bruton).

[110] App. to Opening Br. at A244–46.

"I'm not saying if I did or I didn't"—when he was asked if he had "killed some people in NorthPak."[111]

What is much more, Wing has taken no heed of the Fifth Amendment implications of the testimony he sought to elicit from Burton. It bears noting that the State's objection referred specifically to this concern, and the trial judge recognized it as well. Rather than address it at sidebar, it appears as though Coffield's counsel understood that he was "stuck with"[112] Burton's statement that he would "rather not answer"[113] questions of the kind that drew the State's objection. Seen in this light, the silence of Wing's counsel when Coffield moved on with his cross-examination can be seen more as a capitulation, and a reasonable one at that, than the preservation of a legal argument for appeal. We find no hint of an abuse of discretion on this issue.

## IV

For the reasons set forth above, we affirm Gregory Wing's convictions and the sentences imposed on August 11, 2023.

---

[111] *Id.* at A221.
[112] *Id.* at A227.
[113] *Id*. at A220.